UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

PT-1 COMMUNICATIONS, INC.;                    Case Nos. 01-12655-CEC
PT-1 LONG DISTANCE, INC.; and                           01-12658-CEC
PT-1 TECHNOLOGIES, INC.,                                 01-12660-CEC

                         Debtors.                    Chapter 11

-------------------------------------------------------------x


DECISION


Appearances:


Laurence May, Esq.                        Thomas P. Cole, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.   United States Department of Justice
900 Third Avenue, 16th Floor              Tax Division
New York, New York 10022                  P.O. Box 55
Attorney for Edward P. Bond, Liquidating  Ben Franklin Station
Trustee of the Liquidating Trust U/A/W PT-1   Washington, D.C. 20044
Communications, Inc., PT-1 Long Distance,  Attorney for the Internal Revenue Service
Inc., and PT-1 Technologies, Inc.


CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the second motion of the Liquidating Trustee (the "Trustee") of the Liquidating Trust U/A/W PT-1 Communications, Inc., PT-1 Long Distance, Inc., and PT-1 Technologies, Inc. (the "Liquidating Trust") for summary judgment on his request for declaratory relief authorizing PT-1 to file a tax return for the period of January 1, 2001- March 8, 2001 (the "Stub Period") and for a tax refund of $2,178,891 for the tax period that ended June 30, 1998 (the "1998 Tax Refund") and a refund of $6,913,228.53 plus interest (the "2001 Tax Refund"), which was paid with the tax return for the period of March 9, 2001- December 31, 2001 (the "Short Period").  These refund requests are based on the carryforwards and carrybacks of net operating losses incurred during the Stub Period and the 1999, 2000, and 2002 tax years (collectively, the "NOLs").

The Trustee also seeks the disallowance of the IRS's administrative expense payment request for $581,040 for taxes and interest for the Short Period.  For the reasons set forth below, the Trustee's motion for summary judgment is granted to the extent set forth below.

<u>Jurisdiction</u>

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 1142, and the Eastern District of New York standing order of reference dated August 28, 1986, and the order dated November 23, 2004 confirming the plan of reorganization in this case (the "Confirmation Order").  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

<u>Facts</u>

The following facts were undisputed with respect to this motion, or were found to be undisputed in prior decisions of this Court.

In February 1999, a merger took place whereby the shareholders of PT-1 Communications, Inc. ("PT-1 Communications," and collectively with PT-1 Long Distance, Inc. and PT-1 Technologies, Inc., "PT-1" or the "Debtors") sold their common stock to STAR Telecommunications ("STAR"), making PT-1 Communications a wholly owned subsidiary of STAR, and making the subsidiaries of PT-1 Communications (together with PT-1, and affiliates of PT-1, the "PT-1 Group") indirect wholly owned subsidiaries of STAR.  The PT-1 Group was consolidated with STAR and other affiliated corporations (the "Star Group") for tax reporting purposes and could not file any tax returns on its own behalf.

STAR was indebted to WorldCom Communications Corp. ("WorldCom").  PT-1 guaranteed STAR's obligations, which was secured by certain of PT-1's assets.  STAR also pledged its stock interest in PT-1 to WorldCom and granted WorldCom the right to vote STAR's shares in PT-1 to elect a new board of directors in the event STAR defaulted on its obligations to WorldCom.  STAR defaulted, and WorldCom exercised its right to vote STAR's PT-1 shares to elect a new board of directors, but the shares were not transferred from STAR to WorldCom.

On March 9, 2001, immediately after PT-1's new board was elected, these bankruptcy cases were commenced by the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  No chapter 11 trustee was ever appointed.  PT-1, as debtors and debtors in possession, continued in possession of their assets and in the management of their businesses until the Debtors' Second Amended Joint Plan of Reorganization dated as of August 31, 2004 ("Plan") was confirmed on November 23, 2004.  At that time, as provided in Article 5 of the Plan, certain of the Debtors' assets, rights, and powers were transferred to the Liquidating Trust.

On or about March 15, 2002, STAR filed a request with the IRS for an extension of time to file a consolidated federal tax return for itself and its subsidiaries, including the PT-1 Group.

Pursuant to the extension, the tax return for the group was due by September 16, 2002.

However, a few days before the consolidated tax return was due, STAR informed PT-1 that the

PT-1 Group would not be included in the consolidated tax return.  STAR's purported reason for

refusing to include the PT-1 Group in its consolidated return was that it did not control PT-1,

even though STAR owned PT-1's shares.  STAR contended that WorldCom should include the

PT-1 Group on its tax return because WorldCom had controlled PT-1 ever since PT-1's new

board of directors was elected.  However, WorldCom took the position that PT-1 belonged on

STAR's consolidated tax return.  With both companies refusing to include the PT-1 Group on

their respective consolidated tax returns, the PT-1 Group filed its own tax return for the period

March 9, 2001 through December 31, 2001 (the "Short Period"), paying approximately $6.7

million in taxes and $207,000.00 in interest.  The IRS accepted PT-1's tax return and the tax

payment.  Subsequently, STAR filed for bankruptcy, never filed a consolidated tax return for

2001, and was liquidated.

In February 2004, the PT-1 Group sent a protest letter to the IRS disputing the IRS's

disallowance of net operating losses from 1999 that the PT-1 Group sought to carryback to

reduce its tax liability for the tax year ending December 31, 1998.

On February 6, 2004, the IRS filed a request for an administrative expense payment

seeking $2,064,860.08 in penalties and interest for the Short Period, $25,900,740.77 in taxes,

penalties, and interest for the Stub Period, and $7,189,664.92 for taxes, penalties, and interest for

the tax year ending December 31, 2002 (the "2002 tax year").

On August 13, 2004, the IRS filed an amended request seeking interest and penalties for

the Short Period totaling $2,064,860.08, and again requested $7,189,664.92 for taxes, penalties,

and interest for the 2002 tax year.  It withdrew its request for payment of any taxes, interest, or penalties for the Stub Period.

On March 14, 2005, the Trustee filed a motion to expunge the IRS's request for an administrative expense payment.  The Trustee also sought a declaration that the PT-1 Group was permitted to file a tax return for the Stub Period and carry forward and carry back net operating losses against the taxable income for the Short Period, and sought to recover the 1998 Tax Refund, plus interest, and the 2001 Tax Refund, plus interest.

On March 18, 2005, the IRS filed another amended request seeking taxes, penalties and interest for Short Period totaling $643,298.99, an additional request of $778,623.06 for penalties and interest for the Short Period, and $13,048,272.67 for taxes, interest and penalties for the 2002 tax year.

On August 1, 2006, the IRS filed yet another amended request seeking taxes and interest for the Short Period in the amount of $581,040 arising from the IRS's disallowance of loss carryforwards from the STAR consolidated tax return for the tax year ending December 31, 2000 and loss carrybacks from the 2002 tax year.  It also sought penalties and interest totaling $470,086.54 for PT-1's failure to timely pay its taxes and failure to pay estimated taxes for the Short Period, and $7,863,701.84 for estimated taxes for the 2002 tax year.  The IRS withdrew its previous request for penalties for PT-1's failure to timely file a tax return.

Also on August 1, 2006, the Trustee filed his first motion for summary judgment to disallow the IRS's request for administrative payment of taxes, interest and penalties for the Short Period and the 2002 tax year.  The Trustee also sought summary judgment on his counterclaims seeking authorization for the PT-1 Group to file a tax return for the Stub Period and seeking an award of the 2001 Tax Refund and the 1998 Tax Refund.

On December 7, 2006, this Court granted the Trustee's first motion, in part, and disallowed the IRS's request for administrative payment relating to the 2002 tax year. In re P-T1 Commc'ns, Inc., 357 B.R. 217 (Bankr. E.D.N.Y. 2006).

On March 26, 2007, this Court disallowed the IRS's request for administrative payment of penalties and interest for PT-1's failure to timely pay its taxes for the Short Period. The Court also disallowed the IRS's request for penalties based on PT-1's failure to pay estimated taxes, interest and penalties for the tax year ending December 31, 2001 (the "2001 tax year"), on the basis that the request was time barred. Lastly, the Court denied the Trustee's motion for summary judgment on the counterclaims for declaratory relief and to recover tax refunds, without prejudice to renewal upon a more complete record. In re P-T1 Commc'ns, Inc., 386 B.R. 402 (Bankr. E.D.N.Y. 2007).

On or about April 13, 2007, the PT-Group requested that the IRS designate PT-1 Communications as the agent for the group so that it could file a tax return for the Stub Period. (Tr.[1] 11/13/07 at 5.; Buschel Aff. Ex. B.) PT-1, and its subsidiaries, are the only remaining members of the STAR Group. (Tr. 11/13/07 at 5.) The IRS did not grant PT-1's request. (U.S. Mem. in Opp'n to Second Mot. For Summ. J. at 5.)

On September 21, 2007, the Trustee filed his second motion for summary judgment seeking to expunge the IRS's request for administrative payment of $581,040 for taxes and interest for the Short Period. The Trustee also renewed his request for summary judgment seeking a declaratory judgment directing the IRS to accept the PT-1 Group's Stub Period tax return, and seeking an award of the 1998 Tax Refund and the 2001 Tax Refund, plus interest.

---

[1]  "Tr." refers to the transcript of the hearing held on the date specified.

Thereafter, on November 13, 2007, a hearing was held on the Trustee's second motion for summary judgment.

On March 24, 2008, the IRS filed a motion for authorization to reopen the record to file a supplemental brief asserting recoupment and setoff defenses to the Trustee's counterclaims. The Trustee did not oppose the IRS's motion to supplement the record. Thereafter, on December 3, 2008, a hearing was held during which the Court heard argument from the parties regarding whether the IRS may assert recoupment and setoff defenses.

<u>Standard for Summary Judgment</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue of material fact to be tried. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). A fact is considered material if it "might affect the outcome of the suit under the governing law." <u>Id.</u> at 248. No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-50 (citation omitted). On the other hand, if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994) (citation omitted). "The non-moving party must show that there is more than a metaphysical doubt regarding a material fact and may not rely solely on self-serving conclusory statements." <u>In re Jarrell</u>, 251 B.R. 448, 450-451 (Bankr. S.D.N.Y. 2000).

Here, certain relevant facts, set forth above, are not in dispute.

<u>Discussion</u>

A.    <u>IRS's Request for $581,040 of Taxes and Interest for the Short Period</u>

The Trustee argues that the IRS's August 1, 2006 request for taxes and interest for the

Short Period (the "Short Period Request") is time barred because it was filed after the bar date

for filing requests for payment of administrative expenses, December 23, 2002 (the

"Administrative Bar Date"), and does not amend a timely filed request for payment of that

expense.  This argument is based on the reasoning in this Court's decision dated March 26, 2007

disallowing the IRS's request for payment of penalties and interest for the failure to pay

estimated taxes for the 2001 tax year on the basis that this request was untimely.  <u>In re PT-1</u>

<u>Commc'ns, Inc.</u>, 386 B.R. 402 (Bankr. E.D.N.Y. 2007).

The IRS argues that the untimely Short Period Request should be allowed on the basis of

excusable neglect because the Administrative Bar Date was only three months after PT-1

submitted its tax return for the Short Period.

Bankruptcy Rule 3003(c)(3) provides that a court "shall fix" a bar date by which proofs

of claim in a Chapter 11 case shall be filed.  Fed. R. Bankr. P. 3003(c)(3).  Although there is no

provision relating to a bar date for requesting an administrative expense payment, courts may set

such a date pursuant to Bankruptcy Code § 105.  <u>See</u> <u>In re Reams Broad. Corp.</u>, 153 B.R. 520,

522 (Bankr. N.D. Ohio 1993).  An administrative bar date serves the same purpose as a claims

bar date, which is "finality and debtor rehabilitation,"  9 Collier on Bankruptcy ¶ 3003.03[4]

(Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.), and "enabl[es] the parties to a

bankruptcy case to identify with reasonable promptness the identity of those making claims

against the bankruptcy estate and the general amount of the claims, a necessary step in achieving

the goal of successful reorganization," <u>First Fidelity Bank, N.A., N.J. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.)</u>, 937 F.2d 833, 840 (2d Cir. 1991).  Allowing requests for administrative expense payment to be filed at any time would have the same effect as allowing proofs of claim to be filed at any time, undermining "the institutional means of ensuring the sound administration of the bankruptcy estate."  <u>Hooker</u>, 937 F.2d at 840.

However, a Court may allow a late filed request for administrative expense payment if the creditor establishes that the failure to timely file the request was due to excusable neglect.  <u>See</u> Fed. R. Bankr. P. 9006(b)(1) ("[W]hen an act is required or allowed to be done at or within a specified period by . . . order of the court, the court for cause shown may at any time in its discretion . . . permit the act to be done where the failure to act was the result of excusable neglect."); <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs.</u>, 507 U.S. 380, 389 (1993); <u>In re Dana Corp.</u>, Case No. 06-10354 (BRL), 2007 WL 1577763, at *3 (Bankr. S.D.N.Y. May 30, 2007) ("Only if the claimant can demonstrate excusable neglect may the court apply general principles of equity and permit a late-filed proof of claim, whether an administrative expense claim under section 503 or a general unsecured claim under Bankruptcy Rule 3003."); <u>In re Atcall Inc.</u>, 284 B.R. 791, 798 (Bankr. E.D. Va. 2002) ("Proofs of claims are governed by express bar dates and the procedures for proofs of claims and requests for payment should be as similar as possible.").

Excusable neglect is an "elastic concept," that considers all relevant circumstances, including prejudice to the non-movant, length of the delay and its potential impact on judicial proceedings, reason for the delay (including whether it was within the control of the movant), and whether the movant acted in good faith.  <u>Pioneer</u>, 507 U.S. at 392, 395.  However, the Second Circuit has taken a "hard line" approach in applying the <u>Pioneer</u> standard, emphasizing the reason for the delay in determining whether a movant's failure is due to excusable neglect.

Midland Cogeneration Venuture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 122-123 (2d Cir. 2005); Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366, 368 (2d Cir. 2003).  "[T]he four Pioneer factors do not carry equal weight; the excuse given for the late filing must have the greatest import."  Enron, 419 F.3d at 123 (citations omitted).  The creditor seeking allowance of a late claim bears the burden of proving excusable neglect.  Id. at 121.

The IRS's argument for allowance of the Short Period Request based on excusable neglect must be rejected.  The only reason offered by the IRS for the delay is that the December 23, 2002 bar date was three months after the Debtors' submission of its tax return for the Short Period, and "it is not even clear that the IRS had begun an exam of the [D]ebtors' income tax liability for the 2001 year."  (IRS Mem. in Opp'n at 25.)  The IRS does not explain why three months was an insufficient time in which to calculate the tax liability, or, at a minimum, file an estimated request, and then amend it at a later time.  See Enron, 419 F.3d at 133 ("[A]mendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim." (quoting In re Integrated Res., Inc., 157 B.R. 66, 70 (S.D.N.Y. 1993)(alteration in original))).  By its own admission, the IRS did not file any request for taxes relating to the disallowance of the NOLs until March 18, 2005, more than two years later.  (U.S. Mem. in Opp'n to Second Mot. For Summ. J. at 23.)  Even if the Short Period Request, filed on August 1, 2006, is deemed an amendment to the March 18, 2005 request (amendments to timely filed requests for administrative expense payments are generally allowed, see In re Hudson Oil Co., 91 B.R. 932, 947 (Bankr. D. Kan. 1988)), the IRS has not offered a sufficient reason to justify the delay of more than two years after the Administrative Bar Date before it filed the March 18, 2005 request.

The IRS argues that disallowing the Short Period Request would be inconsistent with Bankruptcy Code § 505 because, had a request for expedited tax review under § 505(b) been made for the 2001 tax year, the IRS would have had 180 days from the filing of the 2001 tax year return to complete its exam.  If a § 505(b) request had been made, the IRS argues, it would have had until March 15, 2003 to complete its exam, whereas the strict application of the Administrative Bar Date would have required the exam to be completed by December 23, 2002.[2]

A bankruptcy court may not alter time periods specified in the Bankruptcy Code unless specifically authorized to do so.  See U.S. Lines, Inc. v. U.S. Lines Reorganization Trust, 262 B.R. 223, 235 (S.D.N.Y. 2001).  Therefore, the order establishing the Administrative Bar Date could not shorten the time period prescribed by Bankruptcy Code § 505(b).  However, even if the bar date were deemed extended to March 15, 2003, the date by which the IRS would have been required to complete review of the PT-1 Group's 2001 tax year return if a request for expedited review had been made under § 505(b), the Short Period Request would still be time barred.  The Short Period Request was not filed until August 1, 2006, and no request for taxes (as opposed to penalties or interest) for the Short Period was filed by the IRS until March 18, 2005, more than two years after March 15, 2003.  The first request for payment of an administrative expense relating to the Short Period (consisting of a request for penalties and interest) was filed on February 6, 2004, also well after March 15, 2003 (if the administrative bar date applicable to the IRS were deemed extended to this date).  The IRS has not offered any reason for this delay.

---

[2]  The IRS also argues that the strict application of the order establishing the Administrative Bar Date would bar any administrative expense incurred after that date.  However, this argument must be rejected; the order provides that the Administrative Bar Date applied only to those expenses incurred post-petition until the date of the order, October 24, 2002.  Requests for payment of an administrative expense incurred after that date would not be barred under the terms of the order.

Additionally, the IRS did not address any of the other <u>Pioneer</u> factors, such as prejudice to the Debtors, or the impact that the allowance of the Short Period Request would have on the judicial proceedings.  Therefore, based on insufficient justification for the delay, and in the absence of any evidence to support a finding that the <u>Pioneer</u> factors weigh in favor of allowing the Short Period Request, the Court denies the IRS's application to allow the Short Period Request.

For these reasons, the IRS's Short Period Request is disallowed as time barred.

B.    <u>Trustee's Counterclaims for Tax Refunds</u>

    1.    <u>Jurisdiction and Waiver of Sovereign Immunity</u>

The IRS argues that sovereign immunity is not waived under Bankruptcy Code § 106 with respect to the counterclaims for refunds because those claims are asserted pursuant to Bankruptcy Code § 1123, which is not listed among the statutory provisions for which sovereign immunity is abrogated under § 160(a).

The Trustee contends that Bankruptcy Code § 505 provides the basis for the counterclaims, and not Bankruptcy Code § 1123.  Therefore, the Trustee argues, the Court has jurisdiction over those claims, and sovereign immunity was abrogated pursuant to Bankruptcy Code § 106(a).  The Trustee further argues that the Administrative Procedures Act, 5 U.S.C. § 500 *et seq*., also confers jurisdiction over the counterclaims upon this Court and waives the IRS's sovereign immunity.

It is well settled that "[i]n any suit in which the United States is a defendant, there must be a cause of action, subject matter jurisdiction, and a waiver of sovereign immunity." <u>Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. and Urban Dev.</u>, 175 F.3d. 132, 139 (2d Cir. 1999).  Although the waiver is a prerequisite to subject matter jurisdiction, the

two issues are distinct.  Id.  Sovereign immunity may only be waived or abrogated by statute.  Id.

Bankruptcy Code § 106 is one of the few statutes that expressly abrogates sovereign immunity

with respect to specified actions in certain circumstances.  11 U.S.C. § 106; Presidential

Gardens, 175 F.3d. at 142.

      Bankruptcy Code § 106 provides, in part:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign
> immunity is abrogated as to a governmental unit to the extent set
> forth in this section with respect to the following:
>
>> (1) Sections 105, 106, 107, 108, 303, 346, 362, 363,
>> 364, 365, 366, 502, 503, 505, 506, 510, 522, 523,
>> 524, 525, 542, 543, 544, 545, 546, 547, 548, 549,
>> 550, 551, 552, 553, 722, 724, 726, 728, 744, 749,
>> 764, 901, 922, 926, 928, 929, 944, 1107, 1141,
>> 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227,
>> 1231, 1301, 1303, 1305, and 1327 of this title. . . .
>
> (b) A governmental unit that has filed a proof of claim in the case
> is deemed to have waived sovereign immunity with respect to a
> claim against such governmental unit that is property of the estate
> and that arose out of the same transaction or occurrence out of
> which the claim of such governmental unit arose.

11 U.S.C. § 106(a)(1), (b).  Thus, § 106 enumerates sections of the Bankruptcy Code which

create causes of action, or provide for or extend a statute of limitations with respect to such

actions, which may be asserted against a governmental entity.  This section "specifically

exclud[es] a debtor's prepetition causes of action that become property of the estate under section

541."  2 Collier on Bankruptcy ¶ 106.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed.

rev.).

      The IRS argues that sovereign immunity has not been waived by Bankruptcy Code §

106(a) with respect to the Trustee's counterclaims because § 1123 is not one of the enumerated

sections under § 106(a).  Section 1123(b)(3)(B) provides that a plan may designate a

representative of the estate to enforce a claim belonging to the debtor or estate.  Here, the

Trustee was designated under the Plan to enforce certain claims of PT-1's estate, including

claims under § 505.  (Plan §§ 5.01, 5.02; Liquidating Trust Agreement §§ 2.1, 3.3; Confirmation

Order ¶¶ 5, 8.)  The statutory basis for the Trustee's counterclaims is thus § 505, not § 1123.

Therefore, the absence of § 1123 from the list in § 106 does not preclude the Trustee from

asserting the counterclaims for tax refunds.

     Even if Bankruptcy Code § 106(a) did not create a waiver of sovereign immunity in this

case, § 106(b) certainly does.  When the IRS files a proof of claim, it is deemed to waive

sovereign immunity as to claims by the debtor arising out of the same transaction.  See Gordon

Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.), 270 F.3d 280, 285-286 (6th Cir.

2001) (IRS waived sovereign immunity as to claim by the debtor by filing proof of claim

because the debtor's claim arose out of the same transaction as the proof of claim).  See also

Gribben v. United States (In re Gribben), 158 B.R. 920, 923 (S.D.N.Y. 2003) ("[T]he purpose of

§ 106(a) [is] to provide that claims and related counterclaims be adjudicated together, rather than

in separate courts and proceedings.").  Here, the IRS filed the Short Period Request, and it is

undisputed that the counterclaims under § 505(a) arise out of the disallowance of NOLs, which is

the basis of the IRS's Short Period Request.

     The IRS also argues that, pursuant to § 7422 of the Internal Revenue Code, this Court

does not have jurisdiction over the counterclaims for the tax refunds because no refund claim for

the 2001 tax year had been filed when the Trustee asserted the counterclaims.  In response, the

Trustee argues that he was not required to file a formal request before asserting the

counterclaims, and that the objection and counterclaim to the IRS's administrative expense

payment request is sufficient in the bankruptcy context under Bankruptcy Code § 505.  The

Trustee further argues that even if a formal refund request were required, that requirement was satisfied by the filing of a "protective refund request" with the IRS on September 12, 2005.

Section 505(a)(2)(B) provides in pertinent part:

> The court may not . . . determine . . . any right of the estate to a tax refund, before the earlier of (i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or (ii) a determination by such governmental unit of such request . . . .

11 U.S.C. § 505(a)(2)(B).  The purpose of § 505(a) is to "provide a forum for the speedy resolution of disputed tax claims in order that the administration of the bankruptcy case could be promptly concluded."  Schroeder v. United States (In re Van Dyke), 275 B.R. 854, 861 (Bankr. C.D. Ill. 2002) (citing In re Sammons, 210 B.R. 197 (Bankr. N.D. Fla. 1997)).

The requirement of § 505(a)(2)(B), that a refund request be filed with the IRS as a prerequisite to the Court's authority to determine the right to a tax refund, is not applicable when the refund is sought as a counterclaim to a proof of claim filed in the bankruptcy case.  United States v. Kearns, 177 F.3d 706, 711 (8th Cir. 1999); In re Rodriguez, 387 B.R. 76, 89 (Bankr. E.D.N.Y. 2008); United States v. Henderson (In re Guardian Trust Co.), 260 B.R. 404, 414 (S.D. Miss. 2000); In re Dunhill Medical, Inc., Case No. 92-37700, 1996 WL 354696, at * 5 (D.N.J. March 27, 1996).  See also 124 Cong. Rec. H 11095, H 11, 110-111 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards) ("The House amendment adopts the rule of the Senate bill that the bankruptcy court can . . . determine the amount of tax refund claim by the trustee.  Under the House amendment, if the refund results from an offset or counterclaim to a claim or request for payment by the [IRS] or other tax authority, the trustee would not first have to file an administrative claim for refund with the tax authority."); 15 Collier on Bankruptcy ¶ TX5.04[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (the requirement of § 505(a)(2)(B)(i)

that the court not determine the right to a refund until 120 days after the trustee properly requests

such refund from the governmental unit "may be dispensed with if the refund arises from an

offset or counterclaim to a claim or request for payment by the [IRS]").

In view of the history of this case and the purpose of Bankruptcy Code § 505, requiring

PT-1 to first file a refund request with the IRS, then wait 120 days, in order to object to the IRS's

Short Period Request and assert counterclaims, would be irrational and inefficient.  See Kearns,

177 F.3d at 711; Van Dyke, 275 B.R. at 860-861 (adopting a "common sense approach" and

considering judicial economy when rejecting the IRS's argument that a refund request was

required to be filed with the IRS prior to the court determining the debtor's right to a refund);

Michaud v. United States, 206 B.R. 1, 5 (D.N.H. 1997) ("When an IRS proof of claim and a

taxpayer's request for [a] refund regard the same tax liabilities, it would be without purpose and

irrational to deny the bankruptcy court jurisdiction to order a refund until the taxpayer makes a

formal request for a refund from the IRS.").

For the foregoing reasons, this Court finds that sovereign immunity is waived as to the

Trustee's counterclaims and that the Court has jurisdiction to hear the counterclaims.  In light of

this finding, the Trustee's arguments that the Administrative Procedures Act confers jurisdiction

over the counterclaims and that the "protective refund request" satisfies the requirement under

§ 505(a)(2)(i) need not be addressed.

2.  Standing

The IRS argues that because the Plan was confirmed, and the property of the estate was

vested in the reorganized Debtors and the Liquidating Trust pursuant to Bankruptcy Code §

1141, there is no "estate" for which the Court can determine the right to a refund pursuant to §

505.  The IRS also argues that a claim under Bankruptcy Code § 505 may only be brought by a

bankruptcy trustee, and the Trustee is not a bankruptcy trustee. Although the IRS concedes that a plan of reorganization can vest the estate in a liquidating trust, it argues that the Trustee, as administrator of the Liquidating Trust, asserts the counterclaims not as a bankruptcy trustee, which the Court may appoint pursuant to § 1104, but in a capacity akin to a receiver, which, pursuant to § 105(b), may not be appointed in bankruptcy. The IRS argues, therefore, that the Trustee does not have standing to assert the counterclaims for the tax refunds, and that the counterclaims are no longer property of the estate.

The Trustee asserts that, pursuant to the Plan and the court-approved Liquidating Trust Agreement, he is the estates' representative pursuant to Bankruptcy Code § 1123(b)(3) with respect to Trust Assets (as defined in the Plan and the Liquidating Trust Agreement to include "all tax refunds and rights thereto for tax years ending prior to January 1, 2005," Plan § 1.01.70; Liquidating Trust Agreement § 1.1.18), and therefore has standing to assert the counterclaims under Bankruptcy Code § 505.

The IRS's argument that § 505 claims may only be brought pre-confirmation by a trustee in bankruptcy has been rejected by a number of courts. See Gordon Sel-Way, 270 F.3d at 284-285; Van Dyke, 275 B.R. at 858-859, 861. See also I.R.S. v. Luongo (In re Luongo), 259 F.3d 323, 328-329 (5th Cir. 2001) (a debtor may bring a claim under § 505, and such a claim is not restricted to bankruptcy trustees). The Gordon Sel-Way and Van Dyke courts found that the IRS's argument to restrict Bankruptcy Code § 505(a)(2) to bankruptcy trustees "seems inconsistent with the broad language of § 505(a) which allows the bankruptcy court to determine the amount or legality of any tax, any fine or any penalty relating to a tax, or any addition to a tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." Gordon Sel-

Way, 270 F.3d at 285 (quoting 11 U.S.C. § 505(a)); Van Dyke, 275 B.R. at 858 (quoting 11

U.S.C. § 505(a)).  Those courts also found support for their conclusion in the legislative history

of § 505, which "indicates that § 505 was not intended to restrict the bankruptcy court

jurisdiction to claims of trustees over property of the estate."  Gordon Sel-Way, 270 F.3d at 285.

This Court adopts the reasoning of these courts, and rejects the IRS's argument.

        This Court also rejects the IRS's argument that the Trustee is acting in the capacity as a

receiver, and therefore lacks standing to assert the counterclaims.  As authorized by § 1123(b),

and pursuant to the Plan, the Trustee succeeded to certain of the rights of the debtors in

possession, which, pursuant to § 1107(a), included "the rights . . . and powers . . . of a trustee."

11 U.S.C. §§ 1107(a), 1123(b).  The Trustee is asserting the counterclaims against the IRS in his

capacity as successor in interest to the Debtors, pursuant to § 1123(b), and not as a receiver.  See

Van Dyke, 275 B.R. at 858-859.

        The error of the IRS's arguments becomes apparent when the interpretation of § 505 that

is urged is considered in the context of §§ 1123 and 1141 of the Bankruptcy Code.  To

understand § 505 to permit only a bankruptcy trustee to bring a claim pursuant to that provision,

and to bring such a claim only before a plan of reorganization is confirmed, and therefore to

preclude a § 505 claim from being asserted by a liquidating trustee appointed pursuant to a plan,

would fly in the face of Bankruptcy Code §§ 1123(b)(3)(B) and 1141.  Those sections explicitly

permit a plan to provide that a representative retain and enforce a claim of the debtor or the

estate, and provide for the vesting of the estate's property in an entity other than the debtor.  11

U.S.C. §§ 1123(b)(3), 1141.  Judicial inquiry must begin with the text of the statute.  See

Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000).  Had

Congress intended to limit the application of § 505 in the manner urged by the IRS, Congress

would have done so, either in the text of § 505 or by carving § 505 out of the claims enforceable post-confirmation pursuant to § 1123(b)(3)(B). Moreover, § 505 does not, by its terms, limit the right to seek a determination of the tax liability of the estate to the bankruptcy trustee. By contrast, the power to bring avoidance actions pursuant to §§ 544, 547, 548 and 549, is expressly conferred on the bankruptcy trustee. Nevertheless, such causes of action are frequently assigned to another entity (such as a creditor's committee or a liquidating trustee) for post-confirmation enforcement pursuant to §§ 1123 and 1141. Official Comm. of Unsecured Creditors v. Macmillan, Inc. (In re Maxwell Newspapers, Inc.), 189 B.R. 282, 286-287 (Bankr. S.D.N.Y. 1995) (committee of unsecured creditors had standing to bring post-confirmation avoidance actions when the plan of reorganization assigned those claims to the committee). If the IRS's argument is adopted, then presumably no such claim of the debtor or the estate may be asserted post-confirmation. This result is inconsistent with Bankruptcy §§ 1123(b)(3) and 1141, and for this reason, too, the IRS's argument must be rejected. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quotations omitted).

For all of these reasons, the Trustee has standing to assert the counterclaims for the tax refunds.

3.    Applicability of the Anti-Injunction Act

The IRS argues that directing it to accept the PT-1 Group's tax return for the Stub Period would violate the Anti-Injunction Act. The Trustee argues that the declaratory relief sought does not run afoul of the Anti-Injunction Act because it will not restrain the assessment or collection of taxes.

The Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person."  26 U.S.C. § 7421(a).  The purpose of this statute is to protect the government's need "to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund."  Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 7 (1962).  See also 26 C.F.R. § 601.103(c)(3) ("After payment of the tax a taxpayer may . . . contest the assessment by filing . . . a claim for a refund of all or any part of the amount paid . . . .").  To permit preemptive challenges to tax collection would "clog the wheels of government."  Louisiana v. McAdoo, 234 U.S. 627, 632 (1914); Gallo v. United States, 950 F. Supp. 1246, 1248 (S.D.N.Y. 1997).

The IRS cites cases in support of its position that the Court cannot force the IRS to accept the PT-1 Group's tax return for the Stub Period because to do so would interfere with its ability to collect taxes.  See Koch v. Alexander, 561 F.2d 1115 (4th Cir. 1977); William B. Scaife & Sons, Co. v. Driscoll, 94 F.2d 664 (3rd Cir. 1937) (finding that directing the IRS to accept an amended return would violate the Anti-Injunction Act where it would cause the tax assessed to be reduced before it was collected, and noting that the taxpayer had the ability to later assert a claim for a refund). The IRS also cites Williams Packing and Laino v. United States, 633 F.2d 626 (2d Cir. 1980), arguing that Trustee failed to show that "it is clear that under no circumstances could the Government ultimately prevail," and that "equity jurisdiction otherwise exists," which are necessary elements in order to maintain a suit for an injunction.

However, the cases cited by the IRS are inapplicable; in each such case the taxpayers sought injunctions directing the IRS to accept amended tax returns before taxes were paid.  Here, by contrast, no taxes are owed for the Stub Period, and the Trustee is not seeking an injunction to

restrain the IRS from collecting unpaid taxes.  The IRS withdrew its claim for taxes for the Stub

Period, as evidenced by the IRS's August 13, 2004 proof of claim, and also withdrew its prior

request for penalties and interest for PT-1's failure to timely file a tax return for Short Period.

The IRS's Short Period Request, and its prior request for payment of penalties and interest for the

failure to pay estimated taxes for the 2001 tax year, were expunged on the basis that they were

time barred.  Lastly, the Court previously determined pursuant to § 505(b) that PT-1 did not have

any tax liability for the 2002 tax year.  In re P-T1 Commc'ns, Inc., 357 B.R. 217 (Bankr.

E.D.N.Y. 2006).  The Trustee is seeking authority to file the tax return for the Stub Period so that

it may seek a refund, in compliance with 26 C.F.R. § 601.103.  The Trustee is not seeking to

restrain the collection of taxes because no taxes are owed.

Directing the IRS to accept the PT-1 Group's tax return for the Stub Period does not

defeat the purpose of the Anti-Injunction Act, which is to protect the government's ability to

collect taxes. The facts presented in this case are entirely different from those cases where a

party is seeking to defeat the purpose of the Anti-Injunction Act.  For example, in S.E.C. v.

Credit Bancorp, Ltd., 297 F.3d 127 (2d Cir. 2002), a court-appointed receiver sought a

determination that the receivership's consumer debts had priority over tax debt, and a

determination that he would not be liable if he used the receivership's assets to satisfy consumer

debts before the tax debt.  The Credit Bancorp court determined that there was "no doubt" that

the purpose of the receiver's requests "was to preclude any possibility of the Government's

collection of taxes." Credit Bancorp, 297 F.3d at 137.  Here, by contrast, the Trustee is not

seeking to prevent the IRS from collecting taxes, because none are owed, but is instead seeking

to obtain tax refunds.  Directing the IRS to accept the tax return for the Stub Period is part of the

relief sought in the context of PT-1's refund action and does not violate the Anti-Injunction Act.

<u>See</u> <u>United States v. Macher (In re Macher)</u>, 303 B.R. 798, 804 (W.D. Va. 2003) (court order directing the IRS to consider a compromise did not constitute an injunction in violation of the Anti-Injunction Act).

      4.      <u>Entitlement to Tax Refunds Without Filing a STAR Tax Return
for the Stub Period</u>

The IRS argues that in order to carryforward and carryback the NOLs, PT-1 Communications must be designated as the agent for the STAR consolidated group in accordance with Treasury Regulation § 1.1502-77A(d) and file the tax return for the STAR Group for the Stub Period.  The IRS states that the PT-1 Group's April 2007 request only sought to have PT-1 Communications designated as the agent for the PT-1 Group, not the STAR Group. The IRS argues that it can only determine whether the NOLs may be carried forward and carried back once the Stub Period tax return for the STAR Group is filed.

The Trustee argues that the IRS, pursuant to Treasury Regulation § 1.1502-77A(d), has the authority to deal directly with the PT-1 Group regarding its tax liability and that it is not necessary for determination of PT-1's entitlement to a refund that PT-1 Communications be designated as the agent for the STAR Group.  The Trustee asserts that the Court can direct the IRS to accept the Stub Period tax return and allow the NOLs pursuant to the Administrative Procedures Act (the "APA").

The APA provides for judicial review of  agency[3] decisions.  5 U.S.C. §§ 701-706. Section 702 of the APA, provides, in relevant part:

> A person suffering legal wrong because of agency action, or
> adversely affected or aggrieved by agency action within the
> meaning of a relevant statute, is entitled to judicial review thereof.

---

[3] The IRS falls within the definition of agency.  5 U.S.C. § 701.

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

> Section 706 of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . <u>arbitrary, capricious, an abuse of discretion</u>, or otherwise not in accordance with law.

5 U.S.C. § 706(2)(A) (emphasis added).

The APA is not a source of subject matter jurisdiction over a claim. <u>Kim v. Ashcroft</u>, 340 F. Supp.2d 384, 388 (S.D.N.Y. 2004). The party seeking relief pursuant to the APA must assert an independent jurisdictional foundation for the claim. <u>Kim</u>, 340 F. Supp.2d at 388.

Although a court may set aside an agency's decision under the APA, it may not simply "substitute its judgment for that of the agency." <u>Soler v. G. & U. Inc.</u>, 833 F.2d 1104, 1107 (2d Cir. 1987). "A successful challenge to an agency's decision under the arbitrary and capricious standard must clearly demonstrate that the agency 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" <u>Id.</u> (quoting <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)).

This Court has jurisdiction to determine PT-1's tax liability, and entitlement to a refund, pursuant to Bankruptcy Code § 505. Furthermore, 28 U.S.C. § 1346(a)(1) gives federal district courts jurisdiction over "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected . . . or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." 28 U.S.C. § 1346(a)(1).

Additionally, although "a bankruptcy court's post-confirmation jurisdiction is narrowly constrained," it is appropriate "when adjudication has an impact on the estate or the recovery of the creditors, such as where resolution of a dispute may substantially increase the asset pool available for distribution to creditors under a liquidating plan." Van Dyke, 275 B.R. at 861. Here, the order confirming the Plan provided that "[t]his court hereby retains jurisdiction for the purposes provided for in the Plan," and the Plan specifically provided for the retention of jurisdiction "[t]o hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code." (Confirmation Order ¶ 31; Plan § 11.01(o).)

Based upon the question of federal law presented, and the retention of post-confirmation jurisdiction over matters concerning federal taxes in accordance with § 505, the requirement for an independent basis for subject matter jurisdiction is met.

The requirement for waiver of sovereign immunity is also met, in that APA § 702 waives sovereign immunity as to PT-1's counterclaims. The relief sought by the Trustee, that the IRS be directed to accept the Stub Period tax return, is clearly a non-monetary claim. Nor may the requests for the tax refunds be characterized as claims for monetary damages. See Bowen v. Massachusetts, 487 U.S. 879, 893 (1988) (distinguishing between money damages, "which are

intended to provide a victim with monetary compensation for an injury to his person, property, or reputation," and equitable relief, "which may include an order providing for . . . monies").

Even if the tax refund counterclaims were considered to be claims for monetary damages, the IRS has waived its sovereign immunity to those counterclaims pursuant to Bankruptcy Code § 106(b) by filing the Short Period Request.

The APA's requirement that a party exhaust administrative remedies prior to seeking relief under the APA is also satisfied.  "When an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is 'final for the purposes of [the APA]' and therefore 'subject to judicial review. . . .'" <u>Darby v. Cisneros</u>, 509 U.S. 137, 146 (1993).  Normally, the only requirement before commencing an action for a refund is the filing of a refund request with the IRS.  <u>See</u> 26 U.S.C. § 7422.  As discussed above, this action is not required in the bankruptcy context when the claims are raised as counterclaims to the IRS's request for payment.

It is clear that the IRS has the authority to deal directly with PT-1 concerning its liability and tax refunds pursuant to 26 C.F.R. § 1.1502-77A(d), which provides:

> If the common parent corporation contemplates dissolution, or is about to be dissolved, or if for any other reason its existence is about to terminate, it shall forthwith notify the Commissioner of such fact and designate, subject to the approval of the Commissioner, another member to act as agent in its place to the same extent and subject to the same conditions and limitations as are applicable to the common parent. If the notice thus required is not given by the common parent, or the designation is not approved by the Commissioner, the remaining members may, subject to the approval of the Commissioner, designate another member to act as such agent, and notice of such designation shall be given to the Commissioner. Until a notice in writing designating a new agent has been approved by the Commissioner, any notice of deficiency or other communication mailed to the common parent shall be considered as having been properly

> mailed to the agent of the group; <u>or, if the Commissioner has reason to believe that the existence of the common parent has terminated, he may, if he deems it advisable, deal directly with any member in respect of its liability.</u>

26 C.F.R. § 1.1502-77A(d) (emphasis added).

Thus, the IRS's assertion that PT-1 may only seek to carryback and carryforward the NOLs once STAR's tax return for the Stub Period is filed is not supported by the applicable Treasury Regulation, which permits the IRS to deal directly with the PT-1 Group in respect of its tax liability.  It is undisputed that PT-1 Communications is unable to file STAR's Stub Period tax return, given that STAR and the other members of the consolidated group are now defunct and that neither PT-1 Communications, nor any other member of the PT-1 Group, has access to their records.  (Tr. 11/13/07 at 13.)

In support of its position, the IRS argued that in order to compute the NOLs from the Stub Period allocable to PT-1 pursuant to 26 C.F.R. § 1.1502-21 (which provides the method of calculating the amount of net operating losses that can be allocated to a member of a consolidated group), the income of the STAR Group from the Stub Period, and any discharge of indebtedness, would have to be taken into consideration.  (Tr. 11/13/07 at 19.)  At the same time, the IRS has acknowledged that PT-1 is not attempting to obtain the benefit of NOLs for the Stub Period or the 2000 tax year that would not otherwise be allocable to it.  (Tr. 11/13/07 at 17.)

The IRS's argument that the PT-1 Group is precluded from filing a stand-alone tax return for the Stub Period, and is thereby precluded from receiving the benefit of the NOLs, because of the possibility of that other members of the STAR Group had tax liability, appears to be makeweight.  It is apparent that the STAR Group did not generate any income during the Stub Period, because the IRS withdrew its claim for taxes for the Stub Period.  Furthermore, the

Trustee's counsel stated, without contradiction or objection by the IRS, that he had conversations with two members of the IRS district counsel who stated that STAR did not have any tax liability during the Stub Period. (Tr. 11/13/07 at 30-31.) It should also be noted that STAR did not receive a discharge of indebtedness because it is a corporate debtor and was liquidated pursuant to its plan of reorganization. See 11 U.S.C. § 1141(d)(3).

Since PT-1 Communications is unable to be designated as the agent for the STAR Group, the PT-1 Group sought to designate PT-1 Communications as the agent for the PT-1 Group, in order to file a tax return for the Stub Period. The IRS did not grant this request because it "made no sense" since "the PT-1 Group itself has filed consolidated returns prior to becoming absorbed into the [STAR] consolidated return." (U.S. Mem. in Opp'n to Second Mot. For Summ. J. at 5, n.2.) This reasoning is obscure at best, and no explanation was offered why the PT-1 Group's prior existence bars its April 2007 request to designate PT-1 Communications as the agent for the PT-1 Group after the liquidation of STAR.

Further evidence of the arbitrariness of the IRS's refusal to designate PT-1 Communications as the agent for the PT-1 Group, and to file the Stub Period return on behalf of the PT-1 Group, is the fact that the IRS accepted the PT-1 Group's post-petition tax returns and tax payments as if it were de-consolidated from the STAR Group. Yet, at the same time, the IRS's counsel stated that the IRS does not have a view as to when, if ever, PT-1 ceased being a member of the STAR Group. (See Tr. 11/13/07 27-29.)

The IRS has refused to designate PT-1 Communications as the agent for the PT-1 Group, and to accept the PT-1 Group's tax return for the Stub Period, even though it is authorized to do so. The IRS does not dispute that PT-1 Communications is in no position to be designated as the agent for the STAR Group, or that PT-1 Communications is unable to file the STAR tax return

for the Stub Period as the agent for the STAR Group, and has acknowledged that the PT-1 Group is not attempting to use any NOLs it would not be entitled to use if it filed on a stand-alone basis. The IRS has also not disputed that there was no taxable income for the STAR Group for that period, and withdrew its proof of claim against PT-1 seeking taxes, penalties, and interest for the Stub Period.  It is clear that the IRS's decision not to designate PT-1 Communications as the agent for the PT-1 Group, as opposed to the STAR Group, and accept the PT-1 Group's Stub Period tax return, "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Soler, 833 F.2d at 1108.

In short, the IRS offered no reason, substantive or otherwise, why PT-1 Communications should not be designated as the agent for the PT-1 Group, and why the PT-1 Group should not be permitted to file a return for the Stub Period and obtain any refund to which it is entitled.  The conclusion is inescapable that the IRS's refusal to deal directly with the PT-1 Group, and its refusal to accept the PT-1 Group's stand-alone tax return for the Stub Period, is arbitrary and capricious.

Therefore, pursuant to the APA, the IRS is directed to accept the Stub Period tax return.

5.    Setoff and Recoupment

The IRS argues that, if the Court finds that the Trustee can recover the tax refunds, the IRS is entitled "to setoff, or recoup, those overpayments against the tax debts identified on the IRS's administrative claim, including the 2002 tax year," notwithstanding the previous determination that PT-1 does not have any tax liability for the 2002 tax year.  (U.S. Supp. Brief at 2.)  The Trustee argues that the IRS's assertions of setoff and recoupment are barred pursuant

to the Plan and 11 U.S.C. § 1141.  The Trustee further argues that, in the event the Court's prior

decision under § 505(b) does not constitute a decision on the merits of the tax liability for the

2002 tax year, the setoff is barred by the statute of limitations.  Lastly, the Trustee argues that no

setoff is available because there is no tax liability against which to setoff the refunds.  The IRS

argues that it may offset the refunds against the tax liability from the 2002 tax year, because "the

debt itself does not go away" (Tr. 12/3/08 at 5), notwithstanding the discharge of such debt or the

Court's prior determination that PT-1 does not have any tax liability for the 2002 tax year.

Setoff "allows entities that owe each other money to apply their mutual debts against

each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" Citizens Bank

of Md. v. Strumpf, 516 U.S. 16, 18 (1995) (quoting Studley v. Boylston Nat'l Bank, 229 U.S.

523, 528 (1913)).  Recoupment involves offsetting claims that are related.  Reiter v. Cooper, 507

U.S. 258, 264 (1993).  The difference between the two doctrines in the bankruptcy context is that

"recoupment is not a 'claim' within the meaning of the Bankruptcy Code and this right is, as a

general matter, unaffected by the debtor's discharge."  Daewoo Int'l (Am.) Corp. Creditor Trust

v. SSTS Am. Corp., Case No. 02 Civ. 9629 (NRB), 2003 WL 21355214, at *5 (S.D.N.Y. June

11, 2003) (citing In re Harmon, 188 B.R. 421, 425 (B.A.P. 9th Cir. 1995)).

Although 11 U.S.C. § 553 does not create a right of setoff, it preserves any such right

available under applicable non-bankruptcy law under certain conditions.  In re Bousa Inc., Case

No. 89-B-13380, 2006 WL 2864964, at * 3 (Bankr. S.D.N.Y. Sept. 29, 2006).  Section 553

provides, in pertinent part:

> Except as otherwise provided in this section and in sections 362
> and 363 of this title, this title does not affect any right of a creditor
> to offset a mutual debt owing by such creditor to the debtor that
> arose before the commencement of the case under this title against
> a claim of such creditor against the debtor that arose before the

> commencement of the case, except to the extent that . . . the claim
> of such creditor against the debtor is disallowed . . . .

11 U.S.C. § 553(a)(1).

The statutory basis for the right of setoff available to the IRS in this case is found in 26

U.S.C. § 6402(a), which provides, in relevant part:

> In the case of any overpayment, the Secretary, within the
> applicable period of limitations, may credit the amount of such
> overpayment, including any interest allowed thereon, against any
> liability in respect of an internal revenue tax on the part of the
> person who made the overpayment and shall . . . refund any
> balance to such person.

26 U.S.C. § 6402(a).

Although preserved under § 553, courts in this Circuit have found that the rights of setoff

and recoupment may be extinguished when a confirmed plan specifically enjoins the assertion of

those rights.  See Bousa, 2006 WL 2864964, at *6;  Daewoo, 2003 WL 21355214, at *4-5. These

conclusions are supported by the Second Circuit's determination that the confirmation of a plan

is given *res judicata* effect.  See Silverman v. Tracar, S.A. (In re Am. Preferred Prescription),

255 F.3d 87, 92 (2d Cir. 2001); Bousa, 2006 WL 2864964, at *5; Katz v. I.A. Alliance Corp. (In

re I. Appel Corp.), 300 B.R. 564, 567 (S.D.N.Y. 2003).

For example, in Daewoo, a trust established pursuant to confirmed chapter 11 bankruptcy

plan brought an action asserting claims for breach of contract and unjust enrichment against a

customer with which the debtor had financing arrangement.  Daewoo, 2003 WL 21355214 at *1-

2.  The customer sought to assert the affirmative defenses of recoupment and setoff.  Id. at *2.

In that case, the order confirming the chapter 11 plan provided, in part:

> [A]ll [e]ntities shall be permanently enjoined and restrained from
> (a) asserting against the [d]ebtor, the [r]eorganized [d]ebtor, . . .
> the [c]reditor [t]rust . . .[or its] assets, any [l]iability that the

> [d]ebtor is released from pursuant to the [p]lan and this
> [c]onfirmation [o]rder, and (b) taking any of the following actions
> against the [d]ebtor, the [r]eorganized [d]ebtor, . . . the [c]reditor
> [t]rust . . . [or its] assets, with respect to any [l]iability so released:
> . . .(iv) the assertion of any right of setoff, subrogation or
> recoupment of any kind against any obligation due from any such
> [e]ntity.

Id. at *1-2.

The Daewoo court held that the customer was barred from asserting defenses of setoff and recoupment because "the confirmed plan of reorganization . . . included a specific prohibition on the assertion of setoff or recoupment claims" against the trust.  Id. at *5.  The court reasoned that "allowing the creditor to come forward after the plan of reorganization has been confirmed and ... decide that it has a valid set-off without timely filing a proof of claim and asserting the set-off in the reorganization proceedings, has a probability of disrupting the plan of reorganization . . . and can conceivably undermine . . . the objectives and structure of the Bankruptcy Code.'" Id. (quoting In re Cont'l Airlines, 134 F.3d 536, 541-542 (3d Cir. 1998)) (omissions in original).

Unlike Daewoo, the court in Bousa determined that assertion by a government creditor (including the IRS) of a right of setoff was not barred by the confirmation order or confirmed plan in that case.  Although the court acknowledged that a confirmation order and plan may bar a creditor's right to assert a claim of setoff, it found that the confirmed plan in that case simply provided a release of claims against the debtor, which "is not equivalent to an express prohibition of the right to setoff," and was therefore "insufficient to extinguish setoff rights, or to put any creditor on adequate notice that it was required to object to the Plan in order to preserve those rights." Bousa, 2006 WL 2864964 at *6.

In this case, the IRS's right of setoff and recoupment did not survive plan confirmation. The Plan specifically provides:

> [A]ll Entities who have held, hold, or may hold Claims, against the Debtors which arose before the Effective Date . . . are permanently enjoined, on and after the Effective Date, from . . . asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or any Release Party on account of such claim.  Such injunction shall extend to successors of the Reorganized Debtors and the Released Parties and their properties and interests in property.

Plan § 10.04.

This provision was explicitly approved in the Confirmation Order, <u>see</u> Confirmation Order, at ¶ 17, and is given *res judicata* effect.  Although the IRS argues that the IRS is somehow exempt from this provision, it does not cite any authority in support of this argument.  Therefore, in light of this injunction provision and the case law in this Circuit, the Court concludes that the IRS s barred from asserting a right of setoff or recoupment, whether or not those rights were previously asserted.  This conclusion makes it unnecessary to consider whether the IRS has waived its right to assert a right of setoff or recoupment, <u>Bousa</u>, 2006 WL 2864964, at *4 (a creditor may waive its right by "act[ing] or fail[ing] to act in a manner reflecting a knowing, voluntary and intentional relinquishment of that legal right"); whether setoff and recoupment are barred by § 1141(d), <u>Daewoo</u>, 2003 WL 21355214, at *5 (allowing the assertion of setoff would undermine the objective of the Bankruptcy Code), or whether the IRS's setoff or recoupment claim is barred by this Court's prior determination pursuant to § 505(b) that PT-1 has no tax liability for the tax year ending December 31, 2002.

6.    Entitlement to Refunds

The Trustee argues that PT-1 is entitled to collect the 1998 Tax Refund and the 2001 Tax Refund based on the carryforward and carryback of the NOLs.

In an action to obtain a tax refund, the taxpayer bears the burden of proving the exact amount the taxpayer is entitled to recover.  U.S. v. Janis, 428 U.S. 433, 440 (1976) (citing Lewis v. Reynolds, 284 U.S. 281 (1932)); Am. Valmar Int'l Ltd. v. C.I.R., 229 F.3d 98, 101, 104 (2d Cir. 2000).  "[I]t is well-settled that in tax refund matters, 'there is a strong presumption that the assessment of taxes owed as determined by the Commissioner of Internal Revenue is correct.'" Thomas v. United States, 56 Fed. Cl. 112, 117 (Ct. Cl., 2003) (quoting KFOX, Inc. v. United States, 510 F.2d 1365, 1369 (Ct. Cl.1975)).  To overcome this presumption, the taxpayer must offer substantial evidence as to the wrongfulness of the IRS's.  Thomas, 56 Fed. Cl. at 117.

A refund claim "puts in issue every credit or deduction found in the particular tax return for which refund is sought or in a related tax return."  Missouri Pac. R.R. Co. v. United States, 338 F.2d 668, 671 (Ct. Cl. 1964).  Therefore, a claim for a refund must be substantiated by "something other than tax returns, uncorroborated oral testimony, or self-serving statements." Mays v. United States, 763 F.2d 1295, 1297 (11th Cir. 1985); Burke v. United States, Civ. No. H-85-242 (MJB), 1988 WL 68048, at *1 (D. Conn. Mar. 22, 1988).  However, tax returns may be accepted provided they are supported by an "evidentiary foundation laid through a competent witness, as prima facie evidence of [the taxpayer's] taxable income."  Zeeman v. United States, 275 F. Supp. 235, 256 (S.D.N.Y. 1967).  Such a foundation is required because "standing by itself, the return is merely self-serving hearsay if offered on behalf of the taxpayer or an admission if offered against her."  Id. at 257 n.8 (citing Greenbaum v. United States, 80 F.2d 113, 125 (9th Cir. 1935)).  A sufficient foundation may be provided through the "testimony of a

qualified accountant who prepared the return and was familiar with the taxpayer's books and records and sources of income, where the books and records [are] available in court as a basis for cross-examination."  Id. (citing Rubin v. C.I.R., 252 F.2d 243 (5th Cir. 1958)).  Additionally, "upon a proper foundation, corporate tax returns fall within the business records exception to the hearsay rule," and may "constitute[] admissible evidence to substantiate that a taxpayer is entitled to claim the deductions listed therein, or that the taxpayer reported its income and other items accurately."  I.R.S. v. Official Comm. Of Unsecured Creditors (In re Indus. Commercial Elec., Inc.), 319 B.R. 35, 54 (D. Mass. 2004).

In some instances, the burden of proof may be shifted to the IRS.  Internal Revenue Code § 7416(a) provides, in pertinent part:

> (a) Burden shifts where taxpayer produces credible evidence.--
>
> (1) General rule.--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.
>
> (2) Limitations.--Paragraph (1) shall apply with respect to an issue only if--
>      (A) the taxpayer has complied with the requirements under this title to substantiate any item;
>      (B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and
>      (C) in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).

26 U.S.C. § 7491(a).  Although "credible evidence" is not defined in the statute, the legislative

history states:

> Credible evidence is the quality of evidence which, after critical
> analysis, the court would find sufficient upon which to base a
> decision on the issue if no contrary evidence were submitted
> (without regard to the judicial presumption of IRS correctness). A
> taxpayer has not produced credible evidence for these purposes if
> the taxpayer merely makes implausible factual assertions,
> frivolous claims, or tax-protestor-type arguments. The introduction
> of evidence will not meet this standard if the court is not convinced
> that it is worthy of belief. If after evidence from both sides, the
> court believes that the evidence is equally balanced, the court shall
> find that the secretary has not sustained his burden of proof.

H.R. Conf. Rep. No. 105-599, at 240-41 (1998).

The IRS did not submit any evidence disputing the refund amounts sought by the

Trustee.  At the hearing held on November 13, 2007, the IRS stated that it was "uncomfortable

with the numbers," (Tr. 11/13/07 at 23); however, this statement is insufficient to raise a

"genuine issue of material fact" as required when confronted with a motion for summary

judgment.  See Jarrell, 251 B.R. at 450-451 ("The non-moving party must show that there is

more than a metaphysical doubt regarding a material fact . . . .").  Over a year later, on December

3, 2008, the Court held a hearing on the IRS's motion to supplement the record to assert its

claims of setoff and/or recoupment.  At that time, the IRS had still not submitted any evidence

disputing the amounts of the 1998 Tax Refund and the 2001 Tax Refund.  Nevertheless, this

Court must evaluate the Trustee's evidence to determine whether he met the initial burden of

proof to obtain the tax refunds.  See Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 26 (2000)

("[T]he burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts

it.")

The Trustee, in support of the amounts sought, submitted an affidavit of Stephen R. Buschel, a tax partner with the national accounting firm of BDO Seidman, LLP, who stated that he was the "in charge of the PT-1 engagement, [and is] fully familiar with the facts relevant to the tax disputes between PT-1 and the IRS during the course of the Chapter 11 Cases." (Buschel Aff. ¶¶ 1, 3.)

In his affidavit, Mr. Buschel explained the basis for the 1998 Tax Refund. He stated that PT-1 filed its own tax return for the year ending June 30, 1998 (before it became a wholly owned subsidiary of STAR and a member of the STAR consolidated group), and paid $2,178,891 in taxes. (Buschel Aff. ¶ 18.) Mr. Buschel further stated that STAR reported significant losses when it filed its tax return for the consolidated group for the 1999 tax year, and that $6,299,032 of its consolidated net operating losses were allocated to PT-1. He explained that PT-1 was permitted "to carry all or portion of these losses back two years and to use it to offset the income reported on its tax return for the tax year ending June 30, 1998; and this is what PT-1 did." (Buschel Aff. ¶ 19.) Mr. Buschel further stated that, on or about July 2, 2002, PT-1 timely filed a claim for the 1998 Tax Refund. (Buschel Aff. ¶ 20.) Attached to Mr. Buschel's affidavit as Exhibit C is PT-1's request for the 1998 Tax Refund, dated June 28, 2002, and attached as Exhibit D is the response received by PT-1 from the IRS disallowing the request. In that response the IRS acknowledged that "[a]n allocation of the loss [from the STAR Group consolidated returns for 1999 and 2000] was completed for carryback purposes and PT-1 was allocated $6,299,032 of the loss for carryback purposes to the separate return year of 199806 [sic]." (Buschel Aff. Ex. D at 2.) The IRS stated that the reason for disallowance was the failure of PT-1 to file a tax return for the Stub Period, which "has the potential of additional tax owed to the Government," and which "is sufficient to offset the claim amount." (Buschel Aff. Ex. D at

6.)  It is now apparent that there is no tax liability for the Stub Period from the STAR Group or

from the PT-1 Group (if the PT-1 Group's tax liability is separately considered), and that the PT-

1 Group has paid all taxes owed for 2001.

This Court has already determined that the IRS must accept the PT-1 Group's tax return

for the Stub Period, and the IRS has expressly acknowledged PT-1's entitlement to carryback the

$6,299,032 of losses allocated from STAR to PT-1 to its separate tax return for 1998.  (Buschel

Aff. Ex. D at 2.)  None of the IRS's reasons for disallowing the 1998 Tax Refund are applicable

any longer, given that the Stub Period return has been filed, and given that there are no unpaid

taxes against which to assert a right of setoff or recoupment against the 1998 Tax Refund (which

rights have been extinguished in any event by the terms of the Plan and the Confirmation Order,

as discussed above).  Therefore, the Trustee is entitled to recover the 1998 Tax Refund.

However, the Trustee's request for the 2001 Tax Refund fails because it is not supported

by sufficient evidence.

Mr. Buschel's affidavit also addressed the Trustee's entitlement to the 2001 Tax Refund.

Mr. Buschel stated that PT-1 paid $6,706,172 in taxes, and $207,056.53 in interest (a total of

$6,913,228.53), based on taxable income of $19,160,492 earned during the Short Period.

(Buschel Aff. ¶¶ 25, 26.)  He explained that "when PT-1's income for the full year of 2001 is

considered (i.e. when the Stub Period and the Short Period are combined) its income is reduced

by $6,933,074 to $12,227,418."  (Buschel Aff. ¶ 25.)  Mr. Buschel further explained that PT-1's

taxable income of $12,227,418 for the tax year ending December 31, 2001 is eliminated after

PT-1 carried forward $7,423,329 in losses from 2000 (which PT-1 asserts was its share of the

losses allocated to it as a member of the STAR consolidated group) and carried back $4,744,089

in losses from 2002.  (Buschel Aff. ¶¶ 25, 26.)  Mr. Buschel further stated that "the entire

amount of those losses totaled $19,160,492 and they offset the reported income for the Short

Period [which, as shown in Ex. G, also totaled $19,160,492] giving rise to the tax refund of

$6,706,172 plus a refund of the interest paid [$207,056.53]." (Buschel Aff. ¶ 26.)

It should be noted that Mr. Buschel's calculation is incorrect.  Based upon the numbers in

the Short Period tax return (incorporated as part of Exhibit G to Mr. Buschel's affidavit), the total

amount of PT-1's taxable income for the year ending December 31, 2001 appears to be $60,000,

because the total amount of the losses listed is $19,100,492 and not, as Mr. Buschel calculated,

$19,160,492.  (Short Period Return at 2, attached as part of Ex. G.)  Upon review, however, it

appears that PT-1's tax return for the Stub Period (also incorporated as part of Exhibit G to Mr.

Buschel's affidavit) listed losses totaling $6,993,074, not $6,933,074.  Therefore, although based

on Mr. Buschel's calculation, PT-1 would have had $60,000.00 in income, based upon the

underlying tax returns, and assuming the other numbers are correct, PT-1 would not have had

any tax liability.

Another inconsistency appears with respect to the losses sought be carried back from the

2000 tax year.  Attached as Exhibit C to Mr. Bushel's affidavit are amended tax returns for the

1998 tax year, one seeking to carry back losses from the 2000 tax year, and one seeking to carry

back losses from the 1999 tax year.  The refund request seeking to carry back the losses from the

2000 tax year to the 1998 tax year was disallowed by the IRS (Buschel Aff. Ex. D), and the

Trustee ultimately agreed with that disallowance (Buschel Aff. Ex. F.).  According to that tax

refund request, the losses sought to be carried back to the 1998 tax year from the 2000 tax year

totaled $7,423,029.  However, the Trustee's request for the 2001 Tax Refund now seeks to carry

forward losses from the 2000 tax year totaling $7,423,329 to the 2001 tax year.  It is unclear

which is the correct amount of the losses incurred in the 2000 tax year.

Even if these relatively minor discrepancies are disregarded, the evidence submitted on this motion is still insufficient to establish entitlement to the 2001 Tax Refund.  Exhibit G to Mr. Buschel's affidavit is the PT-1 Group's protective refund claim for the 2001 Tax Refund. Attached thereto is a statement indicating an allocation of STAR's losses incurred in the year 2000 to PT-1 Communication in the amount of $8,318,707.  That statement is titled "Statement Attached to and Made Part of Amended U.S. Income Tax Return for the Year Ended 12/31/00." The amount of the losses sought to be carried forward by the Trustee ($7,423,329) appears to be taken from the line labeled "limited to remaining 6/30/98 taxable income."  Although the 2000 tax return for the STAR Group is attached in Exhibit C, the Trustee did not supply the amended STAR tax return for the 2000 tax year to which this statement is an exhibit.  This Court cannot conclude that the Trustee is entitled to carry forward $7,423,329 in losses simply because that number appears on a statement purporting to be part of STAR's amended tax return for the 2000 tax year.

Furthermore, although Mr. Buschel stated that PT-1 paid $207,056.53 in interest when it paid its taxes for the Short Period, there is no evidence to substantiate that amount.  Moreover, the Trustee did not submit any evidence to support the assertion that PT-1 is entitled to carry back net operating losses from the 2002 tax year in the amount of $4,744,089.  Although that amount appears on a document entitled "Schedule of Net Operating Loss," which was attached to the Short Period tax return, it does not appear anywhere on PT-1's tax return for the 2002 tax year, which is incorporated as part of Exhibit G to Mr. Buschel's affidavit, and which is also attached as Exhibit D to the affidavit of Laurence May, dated November 7, 2007.  Further explanation is required, but no other evidence was submitted to substantiate the amount of the 2002 losses.

The evidence submitted here is perhaps even less clear than that presented in I.R.S. v. Official Committee Of Unsecured Creditors (In re Industrial Commercial Electrical, Inc.), 319 B.R. 35, 54 (D. Mass. 2004).  There, the debtors sought to carry back losses in order to obtain a tax refund, but the only evidence of net operating losses submitted by the debtors were tax returns.  Id. at 53.  Giving the tax returns full probative value (based upon the IRS's failure to object to the admissibility of the tax returns), the court found that, although the tax returns were evidence of the net operating losses, they were not "credible evidence," so as to shift the burden of proof of the IRS pursuant to § 7491 of the Internal Revenue Code.  The court reasoned that Congress did not intend for § 7491 to modify the "familiar rule that an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer."  Industrial, 319 B.R. at 55.  The Industrial court explained:

> If Congress had wished to make offer of relevant tax returns-or testimony that the relevant tax returns are accurate-sufficient to meet the "credible evidence" requirement, presumably that intent would have manifested itself in the language of the statute or in the legislative history, given that tax returns and testimony as to their validity would likely appear in virtually every case under Section 7491. There is no such indication in either place, however. Thus, to meet the "credible evidence" standard, a taxpayer must present other evidence, such as business records, building deeds, testimony by customers or business partners, and so on.

Industrial, 319 B.R. at 55.

Therefore, based on the inadequacy of the evidence, this Court cannot award the Trustee the 2001 Tax Refund on this record.

## Conclusion

For the foregoing reasons, the Trustee's motion for summary judgment is granted to the extent that the IRS's administrative expense payment request for Short Period is disallowed, the

40

IRS is directed to accept PT-1's Stub Period tax return, and the Trustee is awarded the 1998 Tax

Refund.  The Trustee's motion for summary judgment on his counterclaim for the 2001 Tax

Refund is denied, and this issue is set down for an evidentiary hearing.  A separate order shall

issue herewith.

Dated: Brooklyn, New York
         March 31, 2009

                                                    *s/Carla E. Craig*
                                                    CARLA E. CRAIG
                                                    Chief United States Bankruptcy Judge