UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

| | |
|---|---|
| PT-1 COMMUNICATIONS, INC.; | Case Nos.    01-12655-CEC |
| PT-1 LONG DISTANCE, INC.; and | 01-12658-CEC |
| PT-1 TECHNOLOGIES, INC., | 01-12660-CEC |

Debtors.                    Chapter 11

------------------------------------------------------------x


DECISION


Appearances:

Laurence May, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
900 Third Avenue
New York, New York 10022
Attorneys for Edward P. Bond, Liquidating
Trustee of the Liquidating Trust U/A/W PT-1
Communications, Inc., PT-1 Long Distance,
Inc., and PT-1 Technologies, Inc.

Bartholomew Cirenza, Esq.
Thomas P. Cole, Esq.
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Attorneys for the Internal Revenue Service


CARLA E. CRAIG
Chief United States Bankruptcy Judge

This is the fourth in a series of decisions by this Court addressing the claims of the Internal Revenue Service (the "IRS") in these bankruptcy cases, and addressing the debtors' counterclaims against the IRS seeking payment of tax refunds.  See In re PT-1 Commc'ns, Inc., 403 B.R. 250 (Bankr. E.D.N.Y. 2009); In re PT-1 Commc'ns, Inc., 386 B.R. 402 (Bankr. E.D.N.Y. 2007); In re PT-1 Commc'ns, Inc., 357 B.R. 217 (Bankr. E.D.N.Y. 2006).  This matter arises in the context of a motion of the Liquidating Trustee (the "Trustee") of the Liquidating Trust U/A/W PT-1 Communications, Inc., PT-1 Long Distance, Inc., and PT-1 Technologies, Inc. (the "Liquidating Trust") seeking, among other things, a tax refund of $6,913,228.53 plus interest, which was paid with the tax return for the period of March 9, 2001 - December 31, 2001 (the "Short Period").  An evidentiary hearing was held with respect to the contested issues on this motion.

For the following reasons, Trustee's motion seeking a tax refund is granted in part to the extent that certain deductions are allowed, as more fully set forth herein.

<u>Jurisdiction</u>

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 1142, the Eastern District of New York standing order of reference dated August 28, 1986, and the order dated November 23, 2004 confirming the plan of reorganization in this case.  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

<u>Facts</u>

The following facts were undisputed with respect to this motion, or were found to be

undisputed in one or more of the three prior decisions of this Court in this contested matter,

familiarity with which is assumed.

I.  <u>The Bankruptcy Cases and the IRS's Requests for Payment of Pre and Post Petition Taxes</u>

On March 9, 2001, PT-1 Communications, Inc. ("PT-1 Communications"), PT-1 Long

Distance, Inc. ("PT-1 Long Distance"), and PT-1 Technologies, Inc. (together "PT-1" or the

"Debtors") commenced these bankruptcy cases by filing voluntary petitions for relief under

chapter 11 of the Bankruptcy Code.  No chapter 11 trustee was ever appointed.  PT-1, as debtors

and debtors-in-possession, continued in possession of their assets and in the management of their

businesses until the Debtors' Second Amended Joint Plan of Reorganization dated as of August

31, 2004 ("Plan") was confirmed on November 23, 2004.  At that time, as provided in Article 5

of the Plan, certain of the Debtors' assets, rights, and powers were transferred to the Liquidating

Trust.

On September 16, 2002, the Debtors and their subsidiaries (who were calendar year

taxpayers) filed a tax return for the Short Period, which was the balance of the 2001 tax year after

the commencement of these bankruptcy cases.  In their return, the Debtors reported taxable

income of $19,160,492 for the Short Period, and they paid $6,706,172 in taxes with the return.

The IRS accepted the Debtors' tax return and the tax payment.  On February 14, 2003, the

Debtors paid the IRS $207,056.53 in interest that had accrued on the Short Period taxes.

On February 6, 2004, the IRS filed a request for an administrative expense payment

seeking $2,064,860.08 in penalties and interest for the Short Period, and $25,900,740.77 in taxes,

penalties, and interest for the period January 1, 2001 to March 8, 2001, which was the portion of

the 2001 tax year preceding the Debtors' bankruptcy filing (the "Stub Period"). The IRS also

sought $7,189,664.92 for taxes, penalties, and interest for the 2002 tax year.

On August 13, 2004, the IRS filed an amended request seeking interest and penalties for

the Short Period totaling $2,064,860.08, and seeking $7,189,664.92 for taxes, penalties, and

interest for the 2002 tax year. The IRS withdrew its request for payment of any taxes, interest, or

penalties for the Stub Period.

On August 1, 2006, the IRS filed another amended administrative payment request

seeking taxes and interest for the Short Period in the amount of $581,040 arising from the IRS's

disallowance of loss carryforwards from the 2000 tax year and loss carrybacks from the 2002 tax

year. It also sought penalties and interest totaling $470,086.54 for PT-1's failure to timely pay its

taxes and failure to pay estimated taxes for the Short Period, and $7,863,701.84 for estimated

taxes for the 2002 tax year.

II.    The Trustee's Motions to Disallow the IRS's Request for Administrative Expense
       Payments and Counterclaims for Tax Refunds, and the IRS's Motion to Reopen the
       Record

On March 14, 2005, the Trustee filed a motion to disallow the IRS's requests for

administrative expense payments. The Trustee also sought a declaration that PT-1 was permitted

to file a tax return for PT-1 and its subsidiaries for the Stub Period.[1]  Additionally, the Trustee

---

[1] Prior to filing for bankruptcy, PT-1 was part of the consolidated tax group of STAR Telecommunications.
The history of PT-1's inclusion in the consolidated tax group has been explained in this Court's prior decisions. See
PT-1 Commc'ns, 403 B.R. 250; PT-1 Commc'ns, 386 B.R. 402. Members of consolidated tax groups "are 'treated
as a single entity for income tax purposes as if they were, in fact, one corporation.'" Official Comm. of Unsecured
Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.), 928 F.2d 565, 569 (2d Cir. 1991) (quoting Exxon
Corp. v. United States, 785 F.2d 277, 280 (Fed. Cir. 1986)). Pursuant to Treasury Regulation § 1.1502-77A, the
parent corporation "shall be the sole agent for each subsidiary in the group . . . in all matters relating to the tax
liability for the consolidated return year . . . [and] no subsidiary shall have authority to act for or to represent itself in
any such matter." 26 C.F.R. § 1.1502-77A. For this reason, the IRS took the position that PT-1 was not permitted to

sought to carry forward and carry back net operating losses against the taxable income for the

Short Period; to recover a tax refund of $2,178,891 for the tax period that ended June 30, 1998

plus interest (the "1998 Tax Refund"); and to recover a refund of $6,913,228.53 which was paid

with the Short Period tax return (the "2001 Tax Refund").

On August 1, 2006, the Trustee filed his first motion to disallow the IRS's request for

administrative payment of taxes, interest and penalties for the Short Period and the 2002 tax year.

Additionally, the Trustee sought summary judgment on his counterclaims seeking authorization

for PT-1 to file a tax return for the Stub Period and seeking an award of the 2001 Tax Refund and

the 1998 Tax Refund.

On December 7, 2006, this Court granted the Trustee's first motion, in part, and

disallowed the IRS's request for administrative payment relating to the 2002 tax year.  PT-1

Commc'ns, 357 B.R. 217.

On March 26, 2007, this Court disallowed the IRS's request for an administrative

payment of penalties and interest for PT-1's failure to timely pay its taxes for the Short Period.

The Court also disallowed as time barred the IRS's request for penalties based on PT-1's failure

to pay estimated taxes, interest and penalties for the 2001 tax year.  Lastly, the Court denied the

Trustee's motion for summary judgment on his counterclaims for declaratory relief and to

recover tax refunds, without prejudice to renewal upon a more complete record.  PT-1

Commc'ns, 386 B.R. 402.

---

file a stand-alone tax return for itself and its subsidiaries for the Stub Period.  This issue was resolved in favor of PT-
1 in this Court's prior decision, PT-1 Commc'ns , 403 B.R. 250.

On September 21, 2007, the Trustee filed his second motion for summary judgment seeking to disallow and expunge the IRS's request for an administrative expense payment of $581,040 for taxes and interest for the Short Period.  The Trustee also renewed his request for summary judgment seeking a declaratory judgment directing the IRS to accept PT-1's Stub Period tax return and an award of the 1998 Tax Refund and the 2001 Tax Refund.

On March 31, 2009, this Court granted the Trustee's second motion, in part, and disallowed the IRS's administrative expense payment request for Short Period, directed the IRS to accept PT-1's Stub Period tax return, and awarded the Trustee the 1998 Tax Refund.  PT-1 Commc'ns, 403 B.R. 250.  The Court denied the Trustee's motion with respect to his counterclaim for the 2001 Tax Refund, and scheduled that contested matter for an evidentiary hearing.  Id. at 277.  The evidentiary hearing was held on July 2, 2009, August 26, 2009, and August 27, 2009.  Oral argument was heard on March 25, 2010, and the record was closed.

On July 28, 2010, the IRS filed a motion seeking to reopen the record to introduce additional evidence regarding the sale of assets to IDT in connection with the Trustee's request to carry forward net operating losses from the Stub Period.  A hearing on the IRS's motion was held on September 15, 2010.

This decision addresses the Trustee's entitlement to the 2001 Tax Refund and the IRS's motion to reopen the record.

<u>Testimony Regarding the Nature and Operation of the Debtors' Businesses</u>

Adam Kolodny, formerly the chief operating officer of the Debtors, testified regarding the business of PT-1 Long Distance and PT-1 Communications. As part of his duties, Mr. Kolodny was responsible for the management of the Debtors' billing departments. (Tr.[2] 7/2/09 at 13.) The following is a summary of his testimony regarding the operation of the Debtors' businesses.

I.  <u>PT-1 Long Distance</u>

PT-1 Long Distance was in the telecommunications business; it provided long distance services and processed approximately 10 million calls a month. (Tr. 7/2/09 at 17.) PT-1 Long Distance recorded information relating to each call placed through its switches, including the originating telephone number, duration of the call, and the number which was being called. (Tr. 7/2/09 at 18.) Each call was then rated based upon a billing agreement. (Tr. 7/2/09 at 19.)

In order to obtain payment for calls placed through its switches, PT-1 Long Distance would collect the data from each call processed and then send the information to a billing intermediary (the "Intermediary"), such as Hold Billing Services or ACI. (Tr. 7/2/09 at 19, 20, 26, 86-87.) Some calls, labeled "upfront rejects," would not be included in the information sent to the Intermediary because either the calls were less than six seconds or PT-1 Long Distance's switches did not obtain sufficient information about the call. (Tr. 7/2/09 at 20-21, 72-73, 98.) After receiving PT-1 Long Distance's billing information, the Intermediary would then verify PT-1 Long Distance's billing records and transmit a report back to PT-1 Long Distance summarizing the records and providing a breakdown of calls that were accepted for billing ("accepted revenue") to the local exchange carrier (the "LEC"). (Tr. 7/2/09 at 21-22, 43-44, 72,

---

[2] "Tr." refers to the transcript of the hearing held on the date indicated.

81; Ex. 4.)  PT-1 Long Distance booked its revenue based on these reports; that is, it reported as income the accepted revenue appearing on these reports.  (Tr. 7/2/09 at 98.)

The Intermediary would forward the call information to the LEC.  (Tr. 7/2/09 at 20, 21.) After the LEC received the report from the Intermediary, the LEC would sometimes reject calls for various reasons, for example, if the number was no longer valid or the call could not be billed to an LEC or end user, which would happen when the Intermediary did not have a billing contract with the LEC (the "unbillables").  (Tr. 7/2/09 at 22, 54, 80, 118.)  The unbillables were, however, included in the accepted revenue report that was initially transmitted from the Intermediary to PT-1 Long Distance, on which PT-1 Long Distance booked revenue.  (Tr. 7/2/09 at 83, 110, 113.)  PT-1 Long Distance would then receive a report from the Intermediary summarizing the amount of revenue that was accepted by the LECs, fees owed to the LEC and Intermediary, contractual reserves held back by the LEC and the Intermediary, and the estimated payment that PT-1 Long Distance would receive.  (Ex. 3; Tr. 7/2/09 at 22-23, 29, 36-37, 83-85.) PT-1 Long Distance also received reports of calls that were rejected by the LEC as unbillable. (Tr. 7/2/09 at 110-11, 113.)

PT-1 Long Distance was not paid directly by the caller or the LEC; rather, the LEC would pay PT-1 Long Distance through the Intermediary.  (Tr. 7/2/09 at 20, 29-30, 32-33.) Additionally, the LEC would not pay PT-1 Long Distance the entire amount of accepted revenue based upon the billing report; rather, the LEC would deduct certain amounts on account of the bad debt reserves.  (Tr. 7/2/09 at 22, 29, 33.)  The reserves were contractually required in order to protect the LEC so that the LEC would not pay PT-1 Long Distance more than the LEC would ultimately receive from its customers.  (Tr. 7/2/09 at 29, 31.)  The bad debt reserves were needed

because the LEC would pay PT-1 Long Distance before the LEC was paid by its customers.  (Tr. 7/2/09 at 29, 34.)

The LECs conducted a "true-up" on a quarterly basis, reconciling the reserves with the amounts actually paid by the customers, thereby establishing PT-1 Long Distance's actual bad debt.[3]  (Ex. 2; Tr. 7/2/09 at 31, 34, 38-39, 99.)  After the true-up was completed, PT-1 Long Distance would either receive additional funds if the amount reserved exceeded the amounts collected from the end users, or money would be deducted from amounts sent to PT-1 Long Distance if the bad debts exceeded the reserved amount.  (Tr. 7/2/09 at 38, 99-100, 107.)  PT-1 Long Distance did not have a direct relationship with the LEC or its customers, and relied on the information received through the true-up process, as transmitted by the Intermediary, in order to determine its actual bad debt from operations.  (Tr. 7/2/09 at 30-32.)

In 2002, PT-1 implemented a direct-bill program in order to recover payment of the unbillables directly from the end users.  (Tr. 7/2/09 at 54, 70-71, 73, 75, 77, 79.)  PT-1 did not seek to collect payment from end users on account of the up-front rejects.  (Tr. 7/2/09 at 73, 79.)  PT-1 collected approximately $3 million through this program, and approximately $9-10 million was not collected.  (Tr. 7/2/09 at 55, 78, 117.)  Additionally, PT-1 around that time began to provide services directly to customers, without the use of the Intermediary or the LEC.  (Tr. 7/2/09 at 78, 82.)

---

[3] This testimony was corroborated by the testimony of Rosalind Gaffney, the former director of taxes of PT-1 Long Distance.  (Tr. 8/26/09 at 7, 150-51.)

## II. PT-1 Communications

PT-1 Communications was in the business of issuing pre-paid phone cards. (Tr. 7/2/09 at 66.) A pre-paid phone card was similar to a debit card: a purchaser would buy a pre-paid calling card in a specific amount, and the amount on the card would be reduced as the purchaser made phone calls charged to that card. (Tr. 7/2/09 at 66-67.) PT-1 Communications sold its assets, which consisted of receivables and inventory, to IDT in 2001.[4] (Tr. 7/2/09 at 67; Tr. 8/26/09 at 21-22.)

### Legal Standard

In an action to obtain a tax refund, the taxpayer bears the burden of proving the exact amount the taxpayer is entitled to recover. United States v. Janis, 428 U.S. 433, 440 (1976) (citing Lewis v. Reynolds, 284 U.S. 281 (1932)); Wells Fargo & Co. v. United States, 91 Fed. Cl. 35, 75 (Fed. Cl. 2010). Taxpayers seeking to deduct a net operating loss "bear the burden of establishing both the existence of the [net operating loss] and the amount of any [net operating loss]." Green v. Comm'r, 86 T.C.M. (CCH) 273, 2003 WL 21940722, at *3 (T.C. 2003). This burden must be satisfied by the preponderance of the evidence. Wells Fargo, 91 Fed. Cl. at 75. A deduction of a net operating loss "is a matter of legislative grace; it is not a matter of right." Green, 2003 WL 21940722, at *3 (citing United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955)). See also INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992).

A claim for a refund must be substantiated by "something other than tax returns, uncorroborated oral testimony, or self-serving statements." Mays v. United States, 763 F.2d 1295, 1297 (11th Cir. 1985) (citations omitted); Morse v. United States, No. 94-CV-0619

---

[4] Ms. Gaffney also testified regarding the sale of the phone card business to IDT. (Tr. 8/26/09 at 133, 142.)

(SMG), 1997 WL 842416, at *2 (E.D.N.Y. Dec. 31, 1997); Burke v. United States, Civ. No.

H-85-242 (MJB), 1988 WL 68048, at *1 (D. Conn. Mar. 22, 1988).  However, tax returns may be

accepted provided they are supported by an "evidentiary foundation laid through a competent

witness, as prima facie evidence of [the taxpayer's] taxable income."  Zeeman v. United States,

275 F. Supp. 235, 256 (S.D.N.Y. 1967).  Such a foundation is required because "standing by

itself, the return is merely self-serving hearsay if offered on behalf of the taxpayer or an

admission if offered against [it]."  Id. at n.8 (citing Greenbaum v. United States, 80 F.2d 113, 125

(9th Cir. 1935)); see also Hoopengarner v. Comm'r, 86 T.C.M. (CCH) 723, 2003 WL 22962501,

at *4 (T.C. 2003) ("A tax return is merely a statement of the taxpayer's claim and does not

establish the truth of the matters set forth therein.").  A sufficient foundation may be provided

through the "testimony of a qualified accountant who prepared the return and was familiar with

the taxpayer's books and records and sources of income, where the books and records [are]

available in court as a basis for cross-examination."  Zeeman, 275 F. Supp. at 256 n.8 (citing

Rubin v. Comm'r., 252 F.2d 243 (5th Cir. 1958)).  Additionally, "upon a proper foundation,

corporate tax returns fall within the business records exception to the hearsay rule," and may

"constitute[] admissible evidence to substantiate that a taxpayer is entitled to claim the

deductions listed therein, or that the taxpayer reported its income and other items accurately."

United States v. Official Comm. of Unsecured Creditors (In re Indus. Commercial Elec., Inc.),

319 B.R. 35, 54 (D. Mass. 2005).

In some instances, the burden of proof on an issue may be shifted to the IRS.  Internal

Revenue Code § 7491(a) provides, in pertinent part:

> Burden shifts where taxpayer produces credible evidence.--
>
> > (1) General rule.--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.
> >
> > (2) Limitations.--Paragraph (1) shall apply with respect to an issue only if--
> >
> > > (A) the taxpayer has complied with the requirements under this title to substantiate any item;
> > >
> > > (B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and
> > >
> > > (C) in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).

26 U.S.C. § 7491(a).  The IRS concedes that this burden-shifting statute applies if the Trustee

provides credible evidence supporting his claims.  (IRS Reply to the Liquidating Trustee's Post-

Trial Brief ("IRS Reply"), ECF No. 1192, at 5.)

Although "credible evidence" is not defined in the statute, the legislative history states:

> Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness).  A taxpayer has not produced credible evidence for these purposes if the taxpayer

> merely makes implausible factual assertions, frivolous claims, or tax
> protestor-type arguments. The introduction of evidence will not meet
> this standard if the court is not convinced that it is worthy of belief.
> If after evidence from both sides, the court believes that the evidence
> is equally balanced, the court shall find that the Secretary has not
> sustained his burden of proof.

H.R. Conf. Rep. No. 105-599, at 240-41 (1998); see also Griffin v. Comm'r, 315 F.3d 1017,

1021 (8th Cir. 2003). Admissible evidence does not necessarily constitute credible evidence

sufficient to shift the burden of proof to the IRS. Indus. Commercial, 319 B.R. 54-55.

## Discussion

### I. The 2000 Tax Year

The Trustee seeks to carry forward net operating losses of $7,423,328 from the 2000 tax

year (the "2000 NOL") and apply them against taxable income earned in the Short Period. The

Trustee argues that these losses were incurred by PT-1 Long Distance in the 2000 tax year while

it was part of the consolidated tax group of STAR Telecommunications. (See n. 1, infra.) The

IRS does not dispute that the Trustee is entitled to carry forward the 2000 NOL. (IRS Post-

Evidentiary Hearing Brief ("IRS Brief"), ECF No. 1179, at 50.) However, the IRS argues that

the 2000 NOL must first be applied to reduce the pre-petition taxable income earned in the Stub

Period before being applied to the taxable income generated in the Short Period. (IRS Brief at

50, 51.)

At the evidentiary hearing, the IRS agreed that it is bound by the contentions and

positions taken in the joint pre-trial order. (Tr. 8/26/09 at 111.) Because this argument was not

asserted in the joint pre-trial order, the IRS cannot raise it for the first time in its post-trial brief.

See United States v. Yousef, 327 F.3d 56, 115 (2d Cir. 2003) ("We will not consider an argument raised for the first time in a reply brief."); Fisher v. Kanas, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (citing cases).

II.  The 2001 Tax Year

   A.  The Stub Period[5]

The Trustee argues that PT-1 incurred net operating losses of $6,993,074 during the Stub Period (the "Stub Period NOL"), as claimed on the pro-forma tax return for that period.  (Ex. F, at line 30).  This loss is based upon a claimed deduction of $19,544,947 for the Stub Period, consisting of bad debts of $11,868,413 incurred in connection with the sale of PT-1 Communications' assets to IDT, operational losses incurred by PT-1 Long Distance in the Stub Period totaling $5,323,008, and an M-1 adjustment of $2,353,526 relating to bad debts incurred by PT-1 Long Distance in prior years that were never deducted for tax purposes.

The IRS asserts that the Trustee has not met his burden of proof with respect to these deductions, and that the Debtors did not report the income realized from the sale of PT-1 Communications' assets to IDT.  The IRS contends that when these deductions are disallowed, and the income realized from the IDT transaction is recognized, the Debtors had taxable income during the Stub Period rather than a net operating loss.

The Trustee argues that, under the principle of quasi-estoppel, the IRS should be precluded from arguing that PT-1 had taxable income during the Stub Period to set off against the refund because the IRS withdrew its claims for taxes for that period.  "Quasi estoppel

---

[5] In the joint pre-trial order, the IRS did not dispute the propriety of the bad debt deductions taken in the Short Period.  Therefore, review will be limited to PT-1's deductions taken during the Stub Period.

operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party."  HSBC Bank USA v. Adelphia Commc'ns Corp., Nos. 07-CV-553A, 07-CV-555A, 07-CV-554A, 2009 WL 385474, at *18 (W.D.N.Y. Feb. 12, 2009).

This argument was not included in the joint pre-trial order, and was raised for the first time in the Trustee's supplemental post-trial brief without any notice to the IRS or giving the IRS an opportunity to respond.  Therefore, the Trustee may not raise it at this time.  See Yousef, 327 F.3d at 115; Fisher, 487 F. Supp. 2d at 278.

In any event, the Trustee's argument is rejected on the merits.  The withdrawal by the IRS of a claim for taxes for the Stub Period does necessarily lead to the conclusion that the IRS agreed to the allowance of the bad debt deductions, which would result in losses which could be carried forward to subsequent tax periods.  Rather, the IRS's withdrawal of its claim simply means that the IRS decided not to seek payment of taxes for the Stub Period.  There is no inconsistency between the withdrawal of a claim for taxes and the subsequent opposition to a tax refund claim based upon the disallowance of deductions.

Moreover, there is a "most strict approach to estoppel claims involving public funds." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 426 (1990).  At a minimum, the taxpayer must show that the IRS engaged in "affirmative misconduct."  O'Rourke v. United States, 587 F.3d 537, 542 (2d Cir. 2009).  See also  Wertz v. United States, 51 Fed. Cl. 443, 450 (Fed. Cl. 2002) ("A party seeking to assert equitable estoppel against the government bears an extraordinarily high burden and must, at a minimum, show 'affirmative misconduct.'" (quoting Henry v. United States, 870 F.2d 634, 637 (Fed. Cir. 1989))).  No such showing has been made here.

For these reasons, the IRS is not precluded from challenging the Stub Period NOL.

### 1. PT-1 Long Distance's Operational Bad Debt

The Trustee argues that the credible evidence establishes that PT-1 Long Distance incurred bad debts during the Stub Period from its operations as described in Mr. Kolodny's testimony totaling $5,323,008.  The IRS disagrees, and argues that the burden has not shifted to the IRS with respect to this issue.

The IRS argues that the operational bad debt cannot be claimed as a deduction because it was never included in income.  The Trustee does not dispute that, in order for a bad debt to be claimed as a deduction, the receivable giving rise to the bad debt must first be included in income.  (Post-Evidentiary Hearing Mem. of Law of Edward P. Bond, Liquidating Trustee for the Liquidating Trust of PT- Communications, PT-1 Long Distance, and PT-1 Technologies, Inc. ("Trustee's Brief") ECF No. 1180, at 18.)  Rather, the Trustee argues that the evidence establishes that the bad debt deduction is based on receivables that were included in income, and that the burden has shifted to the IRS to prove otherwise.

The evidence adduced at trial amply supports the Trustee's contention.  Mr. Kolodny explicitly testified that PT-1 Long Distance booked its revenue based upon the initial reports received from the Intermediary, which included all calls except for the up-front rejects.  (Tr. 7/2/09 at 72, 81, 99, 110.)  Mr. Kolodny and Ms. Gaffney also testified that PT-1 Long Distance could not determine its bad debt until the quarterly true-up process was completed (Tr. 7/2/09 at 31, 98; Tr. 8/26/09 at 44-45), which necessarily came after the initial reports from the Intermediary were generated.  This is consistent with the contract between PT-1 Long Distance and the Intermediary, which provided that the Intermediary will forward a report to PT-1 Long

Distance summarizing all the calls that were to be transmitted to the LEC. (Ex. Y, at IRS 0816-0817.) This report must have included the calls that are the basis of the bad debts because, at the time the reports were generated and PT-1 Long Distance booked its income, neither PT-1 Long Distance nor the Intermediary could have known for which calls the LECs would not be paid. Therefore, based upon the testimony and the contract with the Intermediary, this Court concludes that the receivables relating to calls for which PT-1 Long Distance was not ultimately paid by the LEC (the basis of the operational bad debt) were reported as income. The IRS has not provided any evidence to the contrary.

The Court must next address whether the Trustee proved the amount of the allowable operational bad debt deduction for the Stub Period. The IRS concedes that the Trustee would be entitled to claim a deduction in the Stub Period for $2,671,763.30, representing "chargebacks" (IRS Reply, at 28; Tr. 3/25/10 at 95), or calls that were included by PT-1 Long Distance as income but which later were rejected by the LEC for various reasons (Tr. 3/25/10 at 17, 95). Alternatively, the IRS argues that the bad debt deduction should be limited to the amounts shown on Exhibit V, which is a month by month summary of PT-1 Long Distance's net accepted revenue, bad debt reserves, chargebacks, and true-ups for the years 1998 through 2002. The Trustee argues that the PT-1 Long Distance's operational bad debt for the Stub Period is $5,323,008, more than that reflected on Exhibit V.

Section 166(a) of the Internal Revenue Code permits "as a deduction any debt which becomes worthless within the taxable year." 26 U.S.C. § 166(a)(1). "A debt becomes worthless during a taxable year if, based on the available information and surrounding circumstances of the debt, there is no reasonable hope for recovery." Rendall v. Comm'r, 535 F.3d 1221, 1227 (10th

Cir. 2008).  Pursuant to Treasury Regulation § 1.166-1(c), "a bad debt deduction may be taken only for a 'bona fide debt . . . which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.'"  <u>Morse</u>, 1997 WL 842416, at *2 (<u>quoting</u>. 26 C.F.R. § 1.166-1(c)).  "[A] debt is only worthless if, as of the last day of the taxable year, a creditor may reasonably conclude that there is no possibility of future payment and that the debt also lacks any potential value due to the likelihood that it will remain uncollectible in the future."  <u>Rendall</u>, 535 F.3d at 1227.

Rosalind Gaffney, a certified public accountant, was employed by PT-1 and was responsible for filing PT-1's tax returns.  (Tr. 8/26/09 at 4, 6-7.)  She testified that she prepared PT-1's tax returns for the 2001 year.  (Tr. 8/26/09 at 41, 119).  She further testified that a book balance sheet was attached to Stub Period tax return, and that the balance sheet and the return were prepared from PT-1's financial statements, including the annual report and income statement.  (Tr. 8/26/09 at 122-23, 129.)  She did not verify the numbers on the financial statements because they were audited by PT-1's outside auditors.  (Tr. 8/26/09 at 128.)  She also relied on the general ledger when preparing the Stub Period tax return.  (Tr. 8/26/09 at 130.)

Ms. Gaffney testified that the actual bad debt for the Stub Period was determined by examining the "beginning and ending accumulated bad debt account" after the true-up process was completed.  (Tr. 8/26/09 at 150-51.)  Ms. Gaffney did not state the exact amount of PT-1 Long Distance's operational bad debt for the Stub Period.

The IRS argues that the Trustee must identify each call for which it was not paid in order to provide credible evidence of PT-1 Long Distance's operational bad debt.  This argument must be rejected.  The IRS did not provide any authority in support of this position, and indeed, the

argument alters the applicable legal standard.  The Trustee must prove the entitlement to the bad debt deduction by a preponderance of the evidence, <u>Wells Fargo</u>, 91 Fed. Cl. at 75, and must produce credible evidence of PT-1 Long Distance's bad debts before the burden shifts to the government pursuant to Internal Revenue Code § 7491.  Mr. Kolodny testified that PT-1 Long Distance placed approximately 10 million calls per month through its switches.  (Tr. 7/2/09 at 17.)  Requiring the Trustee to provide a record of each call that was not paid by the end user essentially converts the applicable burden of proof from "preponderance of the evidence" to "beyond a reasonable doubt."  This result is unwarranted, and unsupported by case law.

Moreover, the IRS's argument ignores PT-1 Long Distance's business model.  Mr. Kolodny explicitly testified that PT-1 Long Distance booked its revenue on the reports received from the Intermediary and calculated its actual bad debt based upon the results of the true-ups.  (Tr. 7/2/09 at 31, 72, 81, 98.)  He further testified that PT-1 Long Distance did not have any relationship with the LEC or the end users, and had no way of knowing which end users were responsible for the bad debt.  (Tr. 7/2/09 at 30-32, 72, 100.)

The IRS contends that the end users were PT-1 Long Distance's customers through "unwritten contracts," and that the LECs were mere "intermediaries who routed a call from inception onto the PT-1 switches and who (with the help of the . . . Intermediary) acted as a collection agent for PT-1."  (IRS Reply, at 31.)  As such, the IRS argues that the Trustee must prove that PT-1 Long Distance could not collect the bad debts from the end users.

This argument must be rejected.  The contract with the Intermediary reflects that the Intermediary is the collection agent for PT-1 Long Distance and responsible for collecting payments from the LEC and forwarding them to PT-1 Long Distance.  (Ex. Y, at IRS 0816-

0817.)  Accepting the IRS's assertion that the LEC was a collection agent for PT-1 Long Distance would mean that PT-1 Long Distance hired the Intermediary as a collection agent to collect payments from another collection agent, the LEC.  No argument was advanced at the hearing, and no evidence was offered, to support a finding that the LEC was merely a collection agent of PT-1 Long Distance.

Moreover, this characterization of the relationship between PT-1 Long Distance, the Intermediary, the LEC, and the end users is inconsistent with the testimony of Mr. Kolodny concerning the business model of PT-1 Long Distance.  As discussed above, Mr. Kolodny testified that PT-1 Long Distance based its revenue on the reports received from the Intermediary, and determined its bad debt after the true-up process was completed.  (Tr. 7/2/09 at 31, 34, 38, 81.)  This method was used because, as Mr. Kolodny explained, PT-1 Long Distance had no relationship with the LEC or the end users, and had no way of knowing which end users were responsible for the bad debt.  (Tr. 7/2/09 at 30, 31-32, 100.)  Whether or not PT-1 Long Distance knew which end users were responsible for the bad debt, PT-1 Long Distance was compensated by the LEC (through the Intermediary) for placing the calls through PT-1 Long Distance's switches, not by the end users, and the LEC would not pay PT-1 Long Distance more than it received from the end users.  (Tr. 7/2/09 at 29, 30-32.)

Therefore, based upon the testimony and contract between PT-1 Long Distance and the Intermediary, this Court rejects the IRS's argument that the Trustee must detail each call that was unpaid, and prove that it could not be collected from the end user, and concludes that PT-1 Long

Distance is entitled to a bad debt deduction for the amount determined after the true-up process was completed.[6]

The IRS argues that this bad debt deduction is improper because the bad debts "may have already been claimed as a deduction through an addition to a bad debt reserve or comparable account." (Joint Pre-Trial Order at 11-12.) The IRS contends that "[i]n essence, the . . . Trustee is attempting to write-off amounts reserved for possible bad debts." (IRS Brief at 38.) This argument must be rejected.

The Trustee offered the testimony of Mr. Stephen Buschel, a certified public accountant since 1973, who was a partner of BDO Seidman, LLP for 39 years. (Tr. 8/26/09 at 51.) During that time, the firm was retained by the Debtors to assist with the Debtors' various tax issues, and Mr. Buschel was assigned to the matter. (Tr. 8/26/09 at 54.) Mr. Buschel explained that the bad debts could not have been "claimed as deduction through an addition to a bad debt reserve or comparable account" because deductions are only taken "based upon actual bad debt write-offs," and not "for additions to reserve accounts for tax purposes." (Tr. 8/26/09 at 104.) This is consistent with Mr. Kolodny's testimony that PT-1 Long Distance determined its actual bad debts after the true-ups were completed, and not based upon the estimated bad debt reserves. (Tr. 7/2/09 at 31.)

Mr. Buschel's testimony is also consistent with Ms. Gaffney's testimony that, in determining the amounts of the bad debts, she examined the amount remaining in the bad debt allowance account after the true-up process was conducted. (Tr. 8/26/09 at 150-51.) Ms.

---

[6] The IRS also asserted this argument with respect to the deductions taken in 2003, but then conceded that, in order to substantiate bad debts, the Trustee would not have to produce all the records from all the calls that were made. (See Tr. 8/27/09 at 18)

Gaffney further testified that the bad debt deduction was not the reserved amounts.  (Tr. 8/26/09 at 45.)

Therefore, the testimony establishes that the deductions were not based upon additions "to a bad debt reserve or comparable account," or based on the amount of the bad debt reserves. Additionally, as described above, the evidence showed that PT-1 Long Distance included all the receivables (with the exception of up-front rejects) in income, and calculated its bad debt after the true-up process was completed.  Based upon those findings, the IRS's argument that the operational bad debts sought to be deducted by PT-1 Long Distance were simply additions to reserve accounts, must be rejected.

The IRS further argues that PT-1 Long Distance's operational bad debt for 2001 may be included in the "$18,306,258 of improperly deducted bad debts" taken in the 2002 taxable year. (Joint Pre-Trial Order at 12.)  This argument is moot because, as will be discussed below, the contested deductions for the 2002 taxable year are disallowed except to the extent they relate to the operational bad debt incurred in 2002, as shown on Exhibit V.

However, the Trustee has not established by a preponderance of the evidence that the bad debt incurred during the Stub Period was $5,323,008.  The Trustee's documentary evidence on this point was limited to the Stub Period tax return and the schedules attached thereto, which were created by Ms. Gaffney in her preparation of the Stub Period tax return.  (Tr. 8/26/09 at 128, 130.)  The schedules do not reflect any bad debt allowance for PT-1 Long Distance (Tr. 8/26/09 at 144), and Ms. Gaffney admitted that the schedules contained errors, specifically that certain assets and liabilities that were listed as belonging to one PT-1 entity actually belonged to another PT-1 entity.  (Tr. 8/26/09 at 140, 177-79.)

However, credible evidence substantiates PT-1 Long Distance's actual bad debt for the Stub Period in the amount of $3,028,793.15. Ms. Gaffney identified Exhibit V as a document prepared by PT-1's accounting department, and testified that she reviewed it in the course of her duties while employed by PT-1. (Tr. 8/26/09 at 148.) She further testified that PT-1 Long Distance's actual bad debt was reflected in the column labeled "total." (Tr. 8/26/09 at 152.) That exhibit reflects that, during January and February of the Stub Period, the Debtors's actual bad debt was $3,028,793.15. This amount includes the "chargebacks" that the IRS previously conceded is deductible.

While the Trustee argued that the actual bad debt is higher than the amount reflected on Exhibit V, he provided no evidence to substantiate this assertion, and stated that he was willing to accept the amounts reflected in Exhibit V. (Tr. 3/25/10 at 11-12, 14.) Therefore, based upon Exhibit V and the related testimony, this Court finds that PT-1 Long Distance's bad debt for January and February 2001 was $3,028,793.15. The IRS has conceded that, in the event this Court determines that the allowable bad debt deduction is reflected on Exhibit V, the amount of the Stub Period bad debt is $3,892,212.42, taking into account the first eight days of March 2001. (IRS Brief at 42-43.)

For the forgoing reasons, this Court concludes that credible evidence establishes that PT-1 Long Distance is entitled to a bad debt deduction on the Stub Period tax return in the amount of $3,892,212.42. Accordingly, pursuant to Internal Revenue Code § 7491(a), the burden shifted to the IRS with respect to this issue. The IRS has not submitted any evidence to the contrary. Therefore, the Trustee is entitled to this deduction.

2.  PT-1 Communications' Sale of Assets to IDT

The IRS argues that PT-1's Stub Period tax return did not report deferred revenue related to PT-1 Communications' phone card business, and when this income is properly reported, the Stub Period NOL is eliminated by that taxable income.  The IRS's argument must be rejected because the Trustee has shown, by the preponderance of the evidence, that PT-1's Stub Period return reported the deferred revenue.

Ms. Gaffney testified that, in February 2001, PT-1 Communications sold its assets, including inventory and accounts receivable, to IDT for one dollar.  (Tr. 8/26/09 at 21-22, 133, 142, 165.)  She also testified that the balance sheets attached to the Stub Period return reflects that, as of January 1, 2001, the amount of deferred revenue from the phone card business totaled $30,343,706.  (Tr. 8/26/09 at 131.)  Because the assets of the phone card business were sold on February 4, 2001, and because IDT was now responsible for providing the services for the outstanding balance on the sold cards, the balance sheet reflects that the deferred revenue at the end of the Stub Period was zero.  (Tr. 8/26/09 at 131-32, 136.)

Ms. Gaffney explained the deferred revenue was not reported on any 2001 tax return as income because the services related to those sold phone cards had not yet been provided.  (Tr. 8/26/09 at 135-36, 139.)  She testified that, as purchasers used the phone cards, and as PT-1 Communications rendered services, the deferred revenue would be debited by the amount used, and that amount would be included in income.  (Tr. 8/26/09 at 37-38, 135, 162.)  For example, if a phone card worth $30 was purchased, and if the purchaser used $10 for phone calls, PT-1 Communications recognized $10 of income, but continued to defer $20 of revenue.  (Tr. 8/26/09 at 166.)  She testified that reports were generated on a daily basis to determine which cards were

used, and how much income should be recognized. (Tr. 8/26/09 at 167.) However, she testified that after a certain amount of time, all of the deferred revenue from a card would be reported as income even if the card was not used. (Tr. 8/26/09 at 163.)

Ms. Gaffney explained that the total income from the sale of the assets of the phone card business was $5,899,626. (Tr. 8/26/09 at 22, 138.) This number was calculated by reducing the deferred revenue, which was approximately $27 million at the time of the sale, by the total book value of the accounts receivable and the phone card inventory as reflected in PT-1's journals. (Tr. 8/26/09 at 133, 139-40.) Essentially, PT-1 Communications recognized the deferred revenue as income,[7] but also incurred a loss because IDT, and not PT-1 Communications, would be paid the outstanding accounts receivables and would sell the remaining phone card inventory.

Although the pro-forma tax return for the full 2001 tax year reflects that the total income from the sale of the assets was $5,509,647, Ms. Gaffney testified that she later determined, based upon information later received, that the correct amount was $5,899,626 as reported on the Stub Period tax return. (Tr. 8/26/09 at 137-38.) She also testified that the Stub Period bad debt deduction for PT-1 Communications was $11,868,413, as reflected on Statement 22 of the Short Period return. (Tr. 8/26/09 at 146; Ex. F, at IRS 2423.)

In addition to testimony, the Trustee introduced Exhibit 22, which is an excerpt from PT-1's general ledger, and which was received into evidence. Ms. Gaffney testified that Exhibit 22 reflected the sale to IDT, including the amount of deferred revenue, accounts receivable, and inventory. (Ex. 22; Tr. 8/26/09 at 184.) Exhibit 22 substantiates that, when the amount of

---

[7] Mr. Buschel also testified that PT-1 recognized deferred revenue in connection with the sale to IDT, but did not detail the amount of the revenue recognized. (Tr. 8/26/09 at 71.)

deferred revenue ($27,716,362.84) is reduced by the accounts receivable[8] (as further reduced by the $11,868,412.89 bad debt deduction[9]) and by the value of the inventory, the net of the transaction is a gain of $5,899,625.72.  In other words, PT-1 Communications incurred a loss of $21,816,736.12 because the accounts receivable and inventory with a combined <u>book</u> value of $21,816,737.12 were sold for only $1,[10] but simultaneously recognized the deferred revenue of $27,716,362.84, thereby incurring a net gain of $5,899,626.72, as reported on line 10 of the Stub Period tax return.  Because PT-1 Communications determined that it would not collect the doubtful accounts of $11,868,412.89 relating to the receivables, the Debtors claimed this as part of their M-1 adjustment on the Stub Period tax return.  When the loss of $11,868,412.89 is netted against the gain of $5,899,626.72, the result of the entire transaction is a loss of $5,968,786.17.

Alternatively, the tax consequences of the sale can be analyzed as follows: as reflected on Exhibit 22, the combined <u>tax</u> basis of the assets was $33,685,150.01, but PT-1 Communications only received $1, thereby incurring a loss of $33,685,149.01.  However, PT-1 Communications recognized income of $27,716,362.84, which was previously treated as deferred revenue, because PT-1 Communications was no longer obligated to provide services on the sold, but unused,

---

[8] In its post-trial brief, the IRS argues that the record did not establish that PT-1 Communications had accounts receivable (IRS Reply at 25).  Although, Ms. Gaffney testified that she was not aware if PT-1 Communications ever sold phone cards without immediately receiving payment (Tr. 8/26/09 at 38), she specifically testified that PT-1 Communications maintained an accounts receivable account (Tr. 8/26/09 at 38), and Exhibit 22 establishes the existence of such receivables.

[9] The allowance of this bad debt will be discussed below.

[10] In its reply brief, the IRS argues that the Trustee did not establish PT-1 Communications' basis in the property sold.  (IRS Reply at 25.)  However, Ms. Gaffney explained that the assets were essentially liquid assets (Tr. 8/26/09 at 142).  The IRS also argues that the Trustee never attempted to prove that these assets were assets covered under 26 U.S.C. § 1231 for which deduction may be made.  (IRS Reply at 25.)  This argument will not be entertained because it was raised for the first time in the IRS's supplemental post-trial brief, and because the IRS's brief contained no explanation or analysis of 26 U.S.C. § 1231.

calling cards.  When loss from the sale of assets is netted against the gain of income, the result is a loss of $5,968,786.17.

The IRS's argument that the Debtors did not report the deferred revenue as income in the Stub Period return is unpersuasive in light of the testimony and Exhibit 22.  It is clear that the tax return did not contain separate entries to show that the Debtors (1) reported income that was previously deferred, and (2) incurred a loss from the sale of assets (with a tax basis of in excess of $33 million) for $1, as illustrated in the preceding paragraph.  Instead, the evidence establishes that the Debtors collapsed those events into a two separate entries on the tax return (Line 10, reporting the "other income" as a gain and an M-1 adjustment for bad debts).  The IRS has not alleged that there is any tax difference by reporting the transaction in this manner, and its objection elevates form over substance.

After the record was closed, the IRS filed a motion to reopen the record to take notice of an adversary proceeding PT-1 brought against IDT alleging that the sale of PT-1 Communications' assets were a fraudulent conveyance and that a court-approved settlement of this action resulted in the Debtors receiving $14 million from IDT.  The IRS asserts that the sale to IDT was not completed until "any litigation involving the transaction is also completed."  (Tr. 9/15/10 at 11.)  The IRS argues that the complaint shows that PT-1 contended that IDT agreed to take certain actions, and that IDT did not fulfill its obligations, which would have been additional consideration for the sale.

The IRS argues that taking judicial notice of the complaint would allow the Court to view the purchase agreement, which had not been introduced into evidence in this tax refund matter. The IRS further contends that the complaint also highlights the inconsistency between the

positions taken by the Debtors and the Trustee -- a) that the consideration was $1 and b) that the consideration was $1 in addition to certain other obligations of IDT.

The Trustee argues that the IRS has not satisfied the applicable burden to open the record because the IRS (1) has not explained why it never sought to introduce these documents and this argument during the evidentiary hearing or include them in the pre-trial order; (2) did not state whether it knew of the existence of the adversary proceeding and the settlement prior to the evidentiary hearing; and (3) did not explain how the adversary complaint and the settlement are relevant to the accounting that PT-1 used in its Stub Period return.

Although the Trustee does not dispute that judicial notice may be taken of the complaint and the order approving the settlement, the Trustee argues that adopting the IRS's interpretation of the complaint and the settlement prejudices the Trustee because he was not given an opportunity to examine the drafters of the documents or examine the former officers and directors of PT-1 who were involved in the litigation.  The Trustee also argues that the documents may not have been admitted into evidence in the first instance.  Most importantly, the Trustee argues that the complaint and settlement do not have any probative value as to the issues litigated in this matter.

At the outset, this Court notes that the IRS has not given any reason for its failure to introduce the complaint or the settlement as evidence during the evidentiary hearing.  It is obvious that the IRS knew of the adversary proceeding because the IRS's counsel questioned Mr. Buschel about the adversary proceeding during cross examination.  Upon the Trustee's objection

to this line of questioning, the IRS responded:

> Your Honor, there was significant discussion, testimony about the
> prepaid calling -- the sale of the prepaid calling cards and the ultimate
> question is whether the revenue was properly recorded, when it was
> recorded, if it was recorded. And it is [the] Government's
> understanding that there was litigation on this issue . . . . [A]s I
> understand there had to be a payment of some 14 million dollars in
> the year 2004 . . . if [IDT] had to pay any money under the settlement,
> it's my understanding that there was -- I don't have the pleading in
> front of me -- that there was [an] allegation of fraudulent conveyance
> which means there was a transfer with no consideration.

(Tr. 8/27/09 at 9-10.)

Even if the record were reopened to take judicial notice of the complaint and the

settlement, this Court would not reach a different conclusion with respect to the Debtors'

recognition of deferred revenue and the reporting of the sale. The complaint alleges that (1) the

assets were sold to IDT for less than reasonably equivalent value, and that the Debtors actually

received no consideration in exchange for the assets; (2) IDT breached the agreement because it

owed the Debtors $8,981,428 for switch services provided to IDT pursuant to the contract and

$748,327 for associated surcharges; (3) IDT breached the agreement because it failed to

indemnify the Debtors with respect to three pending litigations; and (4) the transaction

constitutes a fraudulent conveyance because the sale agreement was modified by an officer and

director of STAR, on behalf of PT-1, so that obligations owed to PT-1 were released, and monies

owed to PT-1 were instead used to offset against amounts STAR owed to IDT.

The complaint does not establish that PT-1 Communications received more than the

Debtors reported on the Stub Period return; to the contrary, it alleges that PT-1 Communications

received <u>no</u> consideration for the sale of the assets to IDT. Additionally, the settlement is a

global resolution of all of the claims asserted in the complaint, including the recovery of payment for post-agreement services, separate from the sale of assets. The settlement agreement specifically states that the settlement amount will be paid "[a]s a full, final, and complete settlement and resolution of all matters, claims, and disputes by and between [the Debtors and IDT] regarding, concerning or arising out of [the sale of the assets to IDT] and <u>any and all allegations, issues, transactions and claims set forth by either [party] in the [a]dversary [p]roceeding.</u>"  (Settlement ¶ 2 (emphasis added).)

Moreover, it must be noted that this action was brought by PT-1 Communications, as a debtor-in-possession, a different entity than the pre-bankruptcy PT-1 Communications, and that the debtor-in-possession, and not the pre-petition entity, received the settlement payment. Indeed, the pre-bankruptcy PT-1 Communications, which entered into the IDT transaction, could not have asserted a fraudulent conveyance claim on account of that transaction.  (<u>See</u> <u>Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)</u>, 390 B.R. 784, 790-91 (Bankr. S.D.N.Y. 2008) (Fraudulent conveyance claims "are statutory claims belonging to the [debtor-in-possession] and are not claims derivative of the debtor's own rights.")  The IRS has not provided any authority to support its argument that the sale (which involved the pre-petition entity) and the adversary proceeding (which involved the debtor-in-possession) must be collapsed into a single transaction for tax reporting purposes.  This Court rejects the IRS's argument that the consideration received by PT-1 Communications from IDT for the sale of its assets includes the settlement amount received by the debtor-in-possession in the adversary proceeding.

Therefore, this Court concludes that the Debtors reported the deferred revenue as income, and that the complaint and settlement in the adversary proceeding do not establish that the

Debtors obtained additional unreported consideration pursuant to the sale of PT-1
Communications' assets to IDT.

### 3. M-1 Adjustment

The last element of the Stub Period bad debt deduction is an M-1 adjustment of
$14,221,939 based upon receivables that PT-1 Long Distance reported as income in prior years,
but never deducted for tax purposes. The IRS argues that there is no evidence that these debts
became worthless in 2001.

Relying on Statement 22 to the Stub Period return, which details the deductions taken in
Schedule M-1, Ms. Gaffney testified that, when the Debtors' books were reconciled for tax
purposes, it was determined that PT-1 Communications incurred bad debts of $11,868,413, and
PT-1 Long Distance incurred bad debts of $2,353,526. (Tr. 8/26/09 at 154-55.)

As addressed above, the deduction in the Stub Period return of $11,868,413 arose from
bad debts in connection with the sale PT-1 Communications's sale of assets to IDT. Ms. Gaffney
testified that this deduction is based upon income reported for tax purposes in 1999. (Tr. 8/26/09
at 157-58.) However, the Debtors' tax return for 1999 was not introduced in evidence to
corroborate this testimony.

Nonetheless, as discussed above, because the sale of the assets to IDT could have been
accounted for, with the same tax consequences, by recognizing the deferred revenue, and
separately reporting a loss from the sale of the assets with a tax basis for $33,685,149.01 for $1,
instead of reporting two separate losses (the loss incurred upon the sale of the assets as calculated
by the book value, and a separate bad debt deduction), this Court will allow this deduction.

However, the Trustee has not provided credible evidence establishing an allowable deduction based upon an M-1 adjustment of $2,353,526 arising from additional bad debt incurred by PT-1 Long Distance.  The IRS has asserted that the Trustee must substantiate this bad debt deduction by detailing the identity of the end users, and the dates and times relating to the calls that were not paid.  While this Court rejects the notion that this level of specificity is required, it is not possible to conclude, on this record, that the Trustee has introduced credible evidence to show this M-1 adjustment was appropriate.  No testimony or documentary evidence was offered to specify in which years PT-1 Long Distance reported more income for tax purposes than for book purposes, or otherwise explain the circumstances that gave rise to this deduction in the Stub Period.

The testimony established that the true-up process was generally conducted on a quarterly basis.  (Tr. 7/2/09 at 39.)  Presumably, any true-up relating to the last quarter of a year would have been completed before the tax return was due, giving PT-1 sufficient time to include it on the tax return for that year.  Additionally, while PT-1's tax returns from the years 1996, 1997, 1998, and 2000 (Exs. A, B, C, D) were received in evidence, the Trustee has not established, or even alleged, that these are the years in which more income was reported for tax purposes than for book purposes.

The Court is not required to scour the record in order to piece together an argument for the Trustee regarding which years provide the basis for this M-1 adjustment.  St. George v. Mak, No. 5:92CV593 (HBF), 2000 WL 303249, at *1 (D. Conn. Feb. 15, 2000).  See also Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000) ("'While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a

summary judgment motion, it is not required to consider what the parties fail to point out.'" (quoting Downes v. Beach, 587 F.2d 469, 472 (10th Cir.1978))).  Indeed, at the hearing held on March 25, 2010, the Trustee conceded that he "was not sure" if the record contained documentary evidence to support this additional deduction, and has not directed the Court's attention to any such evidence in the post-trial briefing.  (Tr. 3/25/10 at 49.)  Rather, he argued that the testimony of Ms. Gaffney stating that she prepared the tax returns based upon a review of the PT-1's general ledger, books, and records is sufficient to substantiate the M-1 adjustment. (Tr. 3/25/10 at 50-51.)

This Court concludes that unspecific testimony of Ms. Gaffney, without more, does not constitute credible evidence to substantiate the exact amount of an allowable deduction based upon an M-1 adjustment for PT-1 Long Distance's previously unclaimed bad debt.  The books and records on which Ms. Gaffney relied in preparation of the 2001 tax return were not offered into evidence, and were not "available in court as a basis for cross-examination."  Zeeman, 275 F. Supp. at 256 n.8.  The Trustee must prove to this Court the entitlement to the deductions and the exact amounts thereof, and he has not provided any documentary evidence to corroborate the amount of PT-1 Long Distance's bad debt as claimed in the M-1 adjustment.  On this record, this Court cannot conclude that the Trustee is entitled to an M-1 adjustment of $2,353,526.

B.  Short Period

PT-1 claimed an operational bad debt deduction of $10,656,606 on the Short Period return.  The IRS argues that the proper amount of the deduction is $7,885,659.64, or the amount of the chargebacks for that period.

The IRS's argument must be rejected because it was not raised in the joint pre-trial order, nor was it raised at trial. This Court will not disallow those deductions based on an argument raised for the first time in a post-trial brief. See Yousef, 327 F.3d at 115; Fisher, 487 F. Supp. 2d at 278.

In any event, the IRS's argument fails on the merits. As already determined, PT-1 Long Distance's actual bad debt is the amount of bad debt reserves less the amounts received or deducted after the true up, as reflected on Exhibit V. The bad debt deduction on the Short Period return is $10,656,606, and is consistent with Exhibit V. The total amount of bad debt reflected on Exhibit V for the 2001 tax year is $14,548,818.42, and when this is reduced by $3,892,212.42 (the allowed deduction for March 1, 2001 through March 8, 2001, which is included in the Stub Period), the remaining bad debt totals $10,656,606.

Therefore, the credible evidence substantiates a bad debt deduction for the Short Period totaling $10,656,606. The IRS has not provided any evidence to the contrary. Therefore, this deduction is allowed.

III. Losses incurred in 2002

The Trustee seeks to carry back net operating losses from the 2002 tax year in the amount of $5,590,832 (the "2002 NOL") based upon a bad debt deduction of $21,648,496. This deduction is comprised of operational bad debts of $8,500,667 from 2002, and an M-1 adjustment of $13,191,579. The Trustee also seeks to write-off the unamortized adjusted basis of an indefeasible right of use (the "IRU") of $6,823,750. Although the IRS originally opposed the write off relating to the IRU (Joint Pre-Trial Order at 10, 14), after hearing the Trustee's

evidence, the IRS has declined to "make arguments in opposition to [the Trustee's] case." (Tr. 3/25/10 at 4). Accordingly, the deduction relating to the IRU is allowed.

The Trustee argues that, based upon this Court's prior decision applying section §505(b) to the IRS's proof of claim for unpaid taxes for the 2002 tax year, "all burdens of proof, both of going forward and of persuasion, should rest with the IRS" relating to the carryback of the 2002 NOL. (Trustee's Brief at 29.)

The IRS argues that § 505(b) does not preclude it from contesting carryback of the 2002 NOL. Relying on Lewis v. Reynolds, 284 U.S. 281 (1932), the IRS argues that, although it cannot seek payment of additional tax, it may contest a refund action and seek to retain payments already received.

Section 505(b) provides, in pertinent part:

> A trustee may request a determination of any unpaid liability of the estate for any tax incurred during the administration of the case by submitting a tax return for such tax and a request for such a determination to the governmental unit charged with responsibility for collection or determination of such tax . . . . Unless such return is fraudulent, or contains a material misrepresentation, the estate, the trustee, the debtor, and any successor to the debtor are discharged from any liability for such tax –
>
> > (A) upon payment of the tax shown on such return if –
> >
> > > (i) such governmental unit does not notify the trustee, within 60 days after such request, that such return has been selected for examination; or
> > >
> > > (ii) such governmental unit does not complete such an examination and notify the trustee of any tax due, within 180 days after such request or within such additional time as the court, for cause, permits.

11 U.S.C § 505(b).

It is well established that a statute must be given its plain meaning unless doing so would yield an absurd result.  Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000).  According to its terms, § 505(b) relates to "any unpaid liability of the estate," and has no application to a claim for a refund.  Kellogg v. United States (In re Sw. States Mktg. Corp.), 179 B.R. 813, 816 (N.D. Tex. 1994).  Congress could have drafted § 505(b) to also apply to tax refund claims.  See Hartford Underwriters, 530 U.S. at 7 ("[H]ad Congress intended the provision to be broadly available, it could simply have said so . . . ."); Raleigh v. Ill. Dept. of Revenue, 530 U.S. 15, 22 (2000) ("[T]he Code makes no provision for altering the burden on a tax claim, and its silence says that no change was intended."); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Rather, tax refund suits are referenced in § 505(a)(2)(B), which only provides that the Bankruptcy Court will not have jurisdiction to hear such claims until the earlier of 120 days after the trustee makes a claim with the IRS, or the IRS's determination with respect to the request.  11 U.S.C. §505(a)(2)(B); Kellogg, 179 B.R. at 816

The Trustee has not cited any authority to support his assertion that the Debtors' request under § 505(b) results in an exception to the well-established rule that the taxpayer bears the initial burden of proof in a tax refund action.  Section § 505(b) is not a burden-shifting statute, and "in the absence of modification expressed in the Bankruptcy Code the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it."  Raleigh, 530 U.S. at 26. Nor does § 505(b) preclude the IRS from opposing a tax refund claim.  Although the IRS cannot seek payment of additional tax, it may contest a refund action.  See Lewis, 284 U.S. at 283.

Interpreting § 505(b) in this manner does not yield an absurd result, and therefore, it must be construed to apply solely to a determination of the estate's post-petition tax liability, and not to any tax refund liability of the United States.

This Court's prior decisions made no findings relating to the allowance of the 2002 bad debt deduction or the ability to apply the 2002 NOL to the Short Period taxable income, and would provide no basis to preclude any challenge to those items.[11]  Rather, this Court determined that, pursuant to § 505(b), the estate was discharged from the tax liability reflected on the 2002 tax return (which, incidentally, is zero), and expunged the IRS's claim for taxes for that year. There is no inconsistency between the conclusion that the Trustee bears the burden of proof to establish entitlement to the 2001 Tax Refund and the prior determinations of this Court.

A.  PT-1 Long Distance's Operational Bad Debt

The IRS raises the same arguments with respect to the 2002 operational bad debt deduction as it raised to the Stub Period deductions: (1) the bad debts that the Trustee seeks to deduct were never included in income, (2) the deduction should be limited to the $3,342,237.71, which is the total amount of the chargebacks for 2002 as reflected on Exhibit V, and (3) the deduction "may have already been claimed as a deduction through an addition to a bad debt reserve or comparable account."  (Joint Pre-Trial Order at 11; IRS Brief at 40-45.)

To the extent these arguments relate to the deductions taken in connection with the services rendered to the LEC, they are rejected for the same reasons they were rejected relating to

---

[11]  The IRS would have also had no reason to dispute the amounts of the deductions taken on the 2002 tax return in the context of the Trustee's summary judgment motion relating to § 505(b) because the issue presented to the Court on that motion was whether § 505(b) applied, not whether the tax liability reflected on the tax return was correctly calculated.  See Firsdon v. United States, 95 F.3d 444, 448 (6th Cir. 1996) (the government's approval of tax return filings did not precluded it from contesting a refund action based upon net operating losses).

the operational bad debt deduction taken in the Stub Period. However, the Trustee must nonetheless prove the actual amount of the deduction.

Exhibit V reflects that PT-1 Long Distance incurred operational bad debt of $8,133,202.04 for the 2002 taxable year. However, Exhibit 10, which is an excerpt from the Debtors' general ledger (Tr. 7/2/09 at 53), reflects that the operational bad debt for that year is $8,500,667.38. Relying on Exhibit 10, Mr. Buschel and Mr. Kolodny testified that PT-1 Long Distance incurred operational bad debt of $8,500,667.38 during the 2002 tax year. (Tr. 7/2/09 at 54; Tr. 8/26/09 at 80, 100-01).

No evidence was introduced to explain the inconsistency between these two exhibits, and indeed, the Trustee's counsel conceded that he "did not know" why the amounts differ. (Tr. 3/25/10 at 73, 75.) Moreover, no testimony was introduced to explain the meanings of the entries on Exhibit 10 or their relevance. As such, the Trustee has not carried his burden to provide credible evidence that PT-1 Long Distance incurred operational bad debt in 2002 totaling $8,500,667.38. However, Exhibit V is credible evidence that PT-1 Long Distance incurred operational bad debt of $8,133,202.04 in 2002. The IRS has not provided any evidence to the contrary. Therefore, the Trustee is entitled to an operational bad debt deduction of $8,133,202.04 for the 2002 tax year.

B. M-1 Adjustment

The M-1 adjustment claimed on the 2002 tax return is comprised of $13,147,829 of bad debt incurred by PT-1 Long Distance in prior years, and a "miscellaneous" component of $43,750. The IRS concedes that the Debtors are entitled to an M-1 adjustment of $680,801 (IRS Brief at 40 n. 6), and has not disputed the "miscellaneous" portion of the deduction.

The Trustee argues that the bad debt component of the M-1 adjustment, or $13,147,829, is based on receivables that were reported as income in prior years, but that were never collected, and therefore constitute bad debt. The Trustee asserts that most of this debt relates to the unbillables that were not collected after the Debtors sought to recover these debts directly from the end users. The Trustee relies on the Exhibit T and the testimony of Ms. Gaffney and Mr. Buschel to support his argument that the M-1 adjustment of $13,147,829 is properly deductible.

Mr. Buschel testified that this deduction is a "reconciliation between . . . book bad debts and . . . tax bad debts." (Tr. 8/26/09 at 73.) He explained that Schedule L on the 2002 tax return reflects that, at the beginning of the tax year, the Debtors' book allowance for bad debt totaled $14,438,618, but at the end of the year, the allowance was $1,290,789, resulting in an adjustment of approximately $13.2 million. (Tr. 8/26/09 at 81.) He further confirmed that he reviewed the Debtors' prior tax returns and determined that the Debtors had book bad debt that exceeded tax bad debt by at least that amount. (Tr. 8/26/09 at 81-82.) Mr. Buschel also testified that the Debtors provided books and records to the IRS in connection with the IRS's audit to substantiate the M-1 adjustment. (Tr. 8/26/09 at 83.)

Mr. Buschel also testified concerning Exhibit T, which was provided to the IRS in connection with the IRS's audit relating to the Short Period and the 2002 tax year, specifically Information Document Request No. 9. (Tr. 8/26/09 at 101; Ex. T,at IRS 0787.) Mr. Buschel explained that Exhibit T "represents the changes in . . . four allowance accounts for the year 2002," and that "[t]hese changes represents the actual amount of additional bad debts that were written off in 2002." (Tr. 8/26/09 at 101.) He testified that Exhibit T includes excerpts from the Debtors' general ledger relating to the bad debts that were deducted in 2002. (Tr. 8/26/09 at 101-

02.)  He also testified that he reviewed the Debtors' books and records that support the total $21 million bad debt deduction.  (Tr. 8/26/09 at 103.)  However, these books and records were not introduced into evidence during the evidentiary hearing before this Court.

Ms. Gaffney testified that the bad debt component of the M-1 adjustment relates to calls that could have been made in "any number of prior years."  (Tr. 8/26/09 at 48.)  She did not specifically identify which years reported more income for tax purposes than for book purposes. However, she confirmed that Exhibit T "reflects the material from the general ledger that [she] would have reviewed to determined the bad debt expense" for 2002.  (Tr. 8/26/09 at 173.)

Mr. Kolodny testified that a portion of the 2002 M-1 adjustment arose from the direct billing program that was implemented to recover the unbillables that could not be billed to the LECs or the end users in 2001 and 2002.  (Tr. 7/2/09 at 54-55, 76.)  He testified that, in 2002, the Debtors recovered approximately $3 million of those unbillables, and thought that the Debtors did not collect in excess of $10 million.  (Tr. 7/2/09 at 55.)  However, he later testified that the bad debt deduction relating to the unbillables was approximately $9 million.  (Tr. 7/2/09 at 76, 78.)

The Trustee has not specified the amount of the M-1 adjustment that relates to the direct bill program, and simply asserts that "most" of the bad debt arose from the direct bill program. (Trustee's Brief; Supplemental Post-Hearing Mem. of Edward P. Bond, Liquidating Trustee for the Liquidating Trust of PT-1 Long Communications, Inc., PT-1 Long Distance, Inc., and PT-1 Technologies, Inc., in Supp. of Refund Claim against the IRS ("Trustee's Supp. Brief"), ECF No. 1191, at 4.)  The Debtors' responses to the IRS's Interrogatory Nos. 12 and 14 explained that the

losses written off in conjunction with the direct bill program totaled $9,606,039.[12]  (Exhibit Z at

15, 18.)  However, no testimony or documentary evidence was offered to substantiate that

amount.  Mr. Kolodny's testimony only estimated the amounts collected from the unbillables and

the amounts determined to be bad debt.  (Tr. 7/2/09 at 55, 76, 78, 117.)  Similarly, Mr. Buschel

testified that he "can't point to any specific entry [on Exhibit T] dealing directly with the direct

billing write-offs."  (Tr. 8/27/09 at 26.)

    Additionally, no evidence was provided to substantiate the remainder of the bad debts

included in the 2002 M-1 adjustment.  Although the witnesses testified in general that the M-1

adjustment is on account of bad debts previously reported as income for tax purposes, no

testimony specified which years included these receivables as income.  Although Exhibit T

reflects credits and debits to an allowance account for bad debts, there is no indication that these

adjustments were related to prior years' receivables, and if so, to which years they relate.

    In his post-trial brief, the Trustee attempted to substantiate the M-1 adjustment by

examining PT-1's reported income, book income, and deductions from the 2000 tax year, the

Short Period, and the full 2001 tax year.  (Trustee's Brief at 25-26.)  Specifically, the Trustee

asserted that the 2000 STAR consolidated return reflects that PT-1 Long Distance reported

$45,985,752 in taxable income, but a net income per books of only $37,028,227, and $6,543,755

of book bad debts not deducted on the return.  (Ex. D, at IRS 2263, 2306, 2309.)  The Trustee

further asserted that the Short Period tax return reflects taxable income of $21,839,436, book

income of $17,291,420, and book bad debts not deducted in the amount of $2,743,394.  (Ex. G,

---

[12]  The interrogatories, and the responses thereto, were in relation to the Trustee's objection to the IRS's
claims.

at statements 22 and 24.)  Lastly, the Trustee states that the tax return for the full 2001 year

reported taxable income of $30,849,297 and book income of only $21,758,662.[13]  (Ex. E, at IRS

2470, 2493.)

This Court cannot accept the Trustee's argument that the M-1 adjustment on the 2002 tax

return is supported by the returns for the 2000 tax year, Short Period, and the full 2001 tax year.

None of the witnesses or documentary evidence established the exact amount and basis of the

bad debt that comprised the disputed portion of the M-1 adjustment, nor did any of the evidence

establish that those debts were incurred in 2000 or 2001.

Moreover, the Trustee's argument is not supported by the returns.  When the amounts of

the bad debt that the Trustee contends was not deducted for tax purposes in 2000 and 2001 are

added together, the resulting sum does not correspond to the claimed deduction of $13,147,829.

On this record, without any testimony or evidence as to the calculation of the $13,147,829, it is

impossible to determine how this number was derived.

Although Mr. Buschel testified that the Debtors provided the IRS with documents, copies

of general ledger accounts, and copies of journal entries during the course of the IRS's audit to

substantiate the M-1 adjustment (Tr. 8/26/09 at 84), the only documentary evidence provided to

this Court was Exhibit T, which does not provide credible evidence with respect to the disputed

---

[13] The 2001 full year tax return does not reflect the amount of bad debts not deducted for that year, but instead refers to Statement 27.  (See Ex. E, at IRS 2435 at Schedule M-1, line 5.)  Statement 27 reflects that PT-1 Long Distance incurred bad debt of $389,870 that were not deducted on the return.  (Ex. E, at IRS 2495.)  Given that the Short Period is part of the 2001 tax year, it is unclear how PT-1 Long Distance incurred $2,743,394 of book bad debt in the Short Period that were not deducted on the Short Period tax return, but only incurred $389,870 of bad debt during the full 2001 tax year that were not deducted on the full year tax return.  Ms. Gaffney testified that the separate tax returns for the Short Period and the Stub Period were created after the tax return for the full 2001 year (Tr. 8/26/09 at 122, 137), and this may be the cause of the discrepancy.  However, Statement 22 attached to the Stub Period return, which details the entries in Schedule M-1 of the Stub Period return, does not reflect that PT-1 Long Distance incurred any bad debt that it was not deducting on that return.  (Ex. F, at IRS 2423.)

deductions for the reasons stated above.  As conceded by the Trustee, this is a de novo

proceeding (Tr. 8/26/09 at 83-84), and on this record it must be concluded that he has not met his

burden with respect to the disputed portion of the bad debts included in the M-1 adjustment on

the 2002 tax return.  As such, the Trustee is only entitled to claim the undisputed portion of

$680,801.

IV.  Losses incurred in 2003

The Trustee seeks to carry back a net operating loss of $4,062,803 from the 2003 tax year

(the "2003 NOL").  The 2003 NOL is based upon a bad debt deduction of $5,470,721.  The only

evidence offered by the Trustee to substantiate the 2003 NOL is the 2003 tax return, which is

insufficient without a proper foundation.  Zeeman, 275 F. Supp. at 256 n.8.  The Trustee argues

that "[a] thorough examination of the tax return in conjunction with witness testimony, shows

that bad debts reported on the 2003 were not deducted on prior returns," (Trustee's Brief at 26.)

However, no testimony was offered specifically relating to the 2003 NOL, not even that of Ms.

Gaffney regarding whether she prepared the 2003 tax return.  While the cover sheet to the 2003

tax return reflects that Ms. Gaffney submitted the return to the IRS, nothing therein establishes

that she prepared it or reviewed its contents.  Given the complete lack of evidence to substantiate

the 2003 NOL, the carryback of the 2003 NOL is disallowed.

Conclusion

For the foregoing reasons, the Court concludes that the 2000 NOL may be applied toward the taxable income generated during the Short Period, and that the Debtors:

(1) are entitled to a deduction on the Stub Period return totaling $3,892,212.42 arising from PT-1 Long Distance's operational bad debt;

(2) reported PT-1 Communications' deferred revenue as taxable income on the Stub Period return in connection with the sale of assets to IDT;

(3) are entitled to an M-1 adjustment of $11,868,413 on the Stub Period return relating to the sale of assets to IDT;

(4) are not entitled to an M-1 adjustment of $2,353,526 on the Stub Period return relating to bad debts incurred by PT-1 Long Distance in prior years;

(5) are entitled to a deduction of $10,656,606 on the Short Period return arising from PT-1 Long Distance's operational bad debt;

(6) are entitled to a write-off of the unamortized adjusted basis of the IRU of $6,823,750 on the 2002 tax return;

(7) are entitled to a deduction of $8,133,202.04 on the 2002 tax return arising from PT-1 Long Distance's operational bad debt;

(8) are not entitled to an M-1 deduction on the 2002 tax return of $12,467,028 on account of bad debt incurred by PT-1 Long Distance in prior years;

(9) are entitled to an M-1 deduction on the 2002 tax return of $680,801; and

(10) are not entitled to carry back the 2003 NOL.

44

The Trustee is directed to settle an order consistent with this decision and calculating the tax refund owing, if any, for the Short Period based upon the carry forward of the 2000 NOL and the carry forward and carry back of any net operating losses from the Stub Period and the 2002 tax year arising from the allowed deductions.



**Dated: Brooklyn, New York**
**March 3, 2011**

**Carla E. Craig**
**United States Bankruptcy Judge**